Summary
1/22/2018 11:48:11 AM

Differences exist between documents.

**New Document:**
15-1485_new
25 pages (184 KB)
1/22/2018 11:48:08 AM
Used to display results.

**Old Document:**
15-1485
25 pages (184 KB)
1/22/2018 11:48:08 AM

Get started: first change is on page 4.

No pages were deleted

**How to read this report**

Highlight indicates a change.
Deleted indicates deleted content.
▲ indicates pages were changed.
⟷ indicates pages were moved.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DISTRICT OF COLUMBIA ET AL. *v.* WESBY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 15–1485.   Argued October 4, 2017—Decided January 22, 2018

District of Columbia police officers responded to a complaint about loud music and illegal activities in a vacant house.  Inside, they found the house nearly barren and in disarray.  The officers smelled marijuana and observed beer bottles and cups of liquor on the floor, which was dirty.  They found a make-shift strip club in the living room, and a naked woman and several men in an upstairs bedroom.  Many partygoers scattered when they saw the uniformed officers, and some hid.  The officers questioned everyone and got inconsistent stories. Two women identified "Peaches" as the house's tenant and said that she had given the partygoers permission to have the party.  But Peaches was not there.  When the officers spoke by phone to Peaches, she was nervous, agitated, and evasive.  At first, she claimed that she was renting the house and had given the partygoers permission to have the party, but she eventually admitted that she did not have permission to use the house.  The owner confirmed that he had not given anyone permission to be there.  The officers then arrested the partygoers for unlawful entry.

   Several partygoers sued for false arrest under the Fourth Amendment and District law.  The District Court concluded that the officers lacked probable cause to arrest the partygoers for unlawful entry and that two of the officers, petitioners here, were not entitled to qualified immunity.  A divided panel of the D. C. Circuit affirmed.

*Held*:

   1. The officers had probable cause to arrest the partygoers.  Pp. 7–13.

      (a) Considering the "totality of the circumstances," *Maryland* v. *Pringle*, 540 U. S. 366, 371, the officers made an "entirely reasonable inference" that the partygoers knew they did not have permission to

be in the house, *id.*, at 372.  Taken together, the condition of the house and the conduct of the partygoers allowed the officers to make several "'common-sense conclusions about human behavior.'" *Illinois v. Gates,* 462 U. S. 213, 231.  Because most homeowners do not live in such conditions or permit such activities in their homes, the officers could infer that the partygoers knew the party was not authorized. The officers also could infer that the partygoers knew that they were not supposed to be in the house because they scattered and hid when the officers arrived.  See *Illinois* v. *Wardlow*, 528 U. S. 119, 124–125. The partygoers' vague and implausible answers to questioning also gave the officers reason to infer that the partygoers were lying and that their lies suggested a guilty mind.  Cf. *Devenpeck* v. *Alford*, 543 U. S. 146, 149, 155–156.  Peaches' lying and evasive behavior gave the officers reason to discredit everything she said.  The officers also could have inferred that she lied when she said she had invited the partygoers to the house, or that she told the partygoers that she was not actually renting the house.  Pp. 7–11.

(b) The panel majority failed to follow two basic and well-established principles of law.  First, it viewed each fact "in isolation, rather than as a factor in the totality of the circumstances." *Pringle*, *supra*, at 372, n. 2.  Second, it believed that it could dismiss outright any circumstances that were "susceptible of innocent explanation," *United States* v. *Arvizu*, 534 U. S. 266, 277.  Instead, it should have asked whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a "substantial chance of criminal activity," *Gates, supra,* at 244, n. 13.  Pp. 11–13.

2. The officers are entitled to qualified immunity.  Pp. 13–19.

(a) As relevant here, officers are entitled to qualified immunity under 42 U. S. C. §1983 unless the unlawfulness of their conduct was "clearly established at the time," *Reichle* v. *Howards*, 566 U. S. 658, 664.  To be clearly established, a legal principle must be "settled law," *Hunter* v. *Bryant*, 502 U. S. 224, 228, and it must clearly prohibit the officer's conduct in the particular circumstances before him, see *Saucier* v. *Katz*, 533 U. S. 194, 202.  In the warrantless arrest context, "a body of relevant case law" is usually necessary to "'clearly establish' the answer" with respect to probable cause.  *Brosseau* v. *Haugen*, 543 U. S. 194, 199.

Even assuming that the officers lacked actual probable cause to arrest the partygoers, they are entitled to qualified immunity because, given "the circumstances with which [they] w[ere] confronted," they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Anderson* v. *Creighton*, 483 U. S. 635, 640, 641.  The panel majority and the partygoers have failed to identify a single precedent

Syllabus

finding a Fourth Amendment violation "under similar circumstances." *White* v. *Pauly,* 580 U. S. \_\_\_, \_\_\_. And this is not an "obvious case" where "a body of relevant case law" is unnecessary. *Brosseau, supra,* at 199. Pp. 13–16.

(b) Instead of following this straightforward analysis, the panel majority reasoned that, under clearly established District law, a suspect's bona fide belief of a right to enter vitiates probable cause to arrest for unlawful entry. Thus, it concluded that the "uncontroverted evidence" of an invitation in this case meant that the officers could not infer the partygoers' intent from other circumstances or disbelieve their story. But looking at the entire legal landscape at the time of the arrests, a reasonable officer could have interpreted the law as permitting the arrests here. There was no controlling case holding that a bona fide belief of a right to enter defeats probable cause, that officers cannot infer a suspect's guilty state of mind based on his conduct alone, or that officers must accept a suspect's innocent explanation at face value. And several precedents suggested the opposite. Pp. 16–19.

765 F. 3d 13, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, ALITO, KAGAN, and GORSUCH, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in part and concurring in the judgment. GINSBURG, J., filed an opinion concurring in the judgment in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–1485

## DISTRICT OF COLUMBIA, ET AL., PETITIONERS v. THEODORE WESBY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 22, 2018]

JUSTICE THOMAS delivered the opinion of the Court.

This case involves a civil suit against the District of Columbia and five of its police officers, brought by 16 individuals who were arrested for holding a raucous, late-night party in a house they did not have permission to enter. The United States Court of Appeals for the District of Columbia Circuit held that there was no probable cause to arrest the partygoers, and that the officers were not entitled to qualified immunity. We reverse on both grounds.

## I

Around 1 a.m. on March 16, 2008, the District's Metropolitan Police Department received a complaint about loud music and illegal activities at a house in Northeast D. C. The caller, a former neighborhood commissioner, told police that the house had been vacant for several months. When officers arrived at the scene, several neighbors confirmed that the house should have been empty. The officers approached the house and, consistent with the complaint, heard loud music playing inside.

After the officers knocked on the front door, they saw a

man look out the window and then run upstairs. One of the partygoers opened the door, and the officers entered. They immediately observed that the inside of the house "'was in disarray'" and looked like "'a vacant property.'" 841 F. Supp. 2d 20, 31 (DC 2012) (quoting Defs. Exh. A). The officers smelled marijuana and saw beer bottles and cups of liquor on the floor. In fact, the floor was so dirty that one of the partygoers refused to sit on it while being questioned. Although the house had working electricity and plumbing, it had no furniture downstairs other than a few padded metal chairs. The only other signs of habitation were blinds on the windows, food in the refrigerator, and toiletries in the bathroom.

In the living room, the officers found a makeshift strip club. Several women were wearing only bras and thongs, with cash tucked into their garter belts. The women were giving lap dances while other partygoers watched. Most of the onlookers were holding cash and cups of alcohol. After seeing the uniformed officers, many partygoers scattered into other parts of the house.

The officers found more debauchery upstairs. A naked woman and several men were in the bedroom. A bare mattress—the only one in the house—was on the floor, along with some lit candles and multiple open condom wrappers. A used condom was on the windowsill. The officers found one partygoer hiding in an upstairs closet, and another who had shut himself in the bathroom and refused to come out.

The officers found a total of 21 people in the house. After interviewing all 21, the officers did not get a clear or consistent story. Many partygoers said they were there for a bachelor party, but no one could identify the bachelor. Each of the partygoers claimed that someone had invited them to the house, but no one could say who. Two of the women working the party said that a woman named "Peaches" or "Tasty" was renting the house and had given

them permission to be there. One of the women explained that the previous owner had recently passed away, and Peaches had just started renting the house from the grandson who inherited it. But the house had no boxes or moving supplies. She did not know Peaches' real name. And Peaches was not there.

An officer asked the woman to call Peaches on her phone so he could talk to her. Peaches answered and explained that she had just left the party to go to the store. When the officer asked her to return, Peaches refused because she was afraid of being arrested. The sergeant supervising the investigation also spoke with Peaches. At first, Peaches claimed to be renting the house from the owner, who was fixing it up for her. She also said that she had given the attendees permission to have the party. When the sergeant again asked her who had given her permission to use the house, Peaches became evasive and hung up. The sergeant called her back, and she began yelling and insisting that she had permission before hanging up a second time. The officers eventually got Peaches on the phone again, and she admitted that she did not have permission to use the house.

The officers then contacted the owner. He told them that he had been trying to negotiate a lease with Peaches, but they had not reached an agreement. He confirmed that he had not given Peaches (or anyone else) permission to be in the house—let alone permission to use it for a bachelor party. At that point, the officers arrested the 21 partygoers for unlawful entry. See D. C. Code §22–3302 (2008). The police transported the partygoers to the police station, where the lieutenant decided to charge them with disorderly conduct. See §22–1321. The partygoers were released, and the charges were eventually dropped.[1]

_____

[1] In their merits brief, the partygoers attempt to dispute several of these facts. See Brief for Respondents 26–30. But the facts they now

## II

Respondents, 16 of the 21 partygoers, sued the District and five of the arresting officers. They sued the officers for false arrest under the Fourth Amendment, Rev. Stat. §1979, 42 U. S. C. §1983, and under District law. They sued the District for false arrest and negligent supervision under District law. The partygoers' claims were all "predicated upon the allegation that [they] were arrested without probable cause." 841 F. Supp. 2d, at 32.

On cross-motions for summary judgment, the District Court awarded partial summary judgment to the partygoers. *Id.*, at 48–49. It concluded that the officers lacked probable cause to arrest the partygoers for unlawful entry.[2] *Id.,* at 32–33. The officers were told that Peaches had invited the partygoers to the house, the District Court reasoned, and nothing the officers learned in their investigation suggested the partygoers "'knew or should have known that [they were] entering against the [owner's] will.'" *Id.*, at 32. The District Court also concluded that the officers were not entitled to qualified immunity under

contest were presented in the petition for a writ of certiorari, and the partygoers did not contest them in their brief in opposition. Under this Court's Rule 15.2, the partygoers' failure to contest these factual assertions at the certiorari stage waived their right to do so at the merits stage. See *Carcieri* v. *Salazar*, 555 U. S. 379, 395–396 (2009).

Furthermore, although both parties moved for summary judgment, the undisputed facts here are sufficient to resolve both probable cause and qualified immunity. Our analysis thus would not change no matter which party is considered the moving party. Cf. *Scott* v. *Harris*, 550 U. S. 372, 378–379 (2007) (explaining that, at summary judgment, courts must view the facts and draw reasonable inferences in favor of the nonmoving party).

[2] Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking. See *Devenpeck* v. *Alford*, 543 U. S. 146, 153–155, and n. 2 (2004). Because unlawful entry is the only offense that the District and its officers discuss in their briefs to this Court, we likewise limit our analysis to that offense.

§1983.[3]  It noted that, under District case law, "probable cause to arrest for unlawful entry requires evidence that the alleged intruder knew or should have known, upon entry, that such entry was against the will of the owner." *Id.,* at 37.  And in its view, the officers had no such evidence. *Id.,* at 32–33, 37–38.

With liability resolved, the case proceeded to trial on damages.  The jury awarded the partygoers a total of $680,000 in compensatory damages.  After the District Court awarded attorney's fees, the total award was nearly $1 million.

On appeal, a divided panel of the D. C. Circuit affirmed. On the question of probable cause, the panel majority made Peaches' invitation "central" to its determination that the officers lacked probable cause to arrest the partygoers for unlawful entry.  765 F. 3d 13, 21 (2014).  The panel majority asserted that, "in the absence of any conflicting information, Peaches' invitation vitiates the necessary element of [the partygoers'] intent to enter against the will of the lawful owner." *Ibid.*  And the panel majority determined that "there is simply no evidence in the record that [the partygoers] had any reason to think the invitation was invalid." *Ibid.*

On the question of qualified immunity, the panel majority determined that it was "perfectly clear" that a person with "a good purpose and bona fide belief of her right to enter" lacks the necessary intent for unlawful entry. *Id.,* at 27.  In other words, the officers needed "some evidence" that the partygoers "knew or should have known they were entering against the will of the lawful owner." *Ibid.*

---

[3] The District Court granted summary judgment against two of the officers, but denied summary judgment against the other three because there were triable issues regarding qualified immunity.  See 841 F. Supp. 2d 20, 32–46 (DC 2012).  The partygoers voluntarily dismissed their claims against those three officers.  See 765 F. 3d 13, 17 (CADC 2014).

And here, the panel majority asserted, the officers must "have known that uncontroverted evidence of an invitation to enter the premises would vitiate probable cause for unlawful entry." *Ibid.*

Judge Brown dissented. She concluded that summary judgment on the false-arrest claims was improper because, under the totality of the circumstances, a reasonable officer "could disbelieve [the partygoers'] claim of innocent entry" and infer that they knew or should have known that they did not have permission to be in the house. *Id.,* at 34. She also disagreed with the denial of qualified immunity, contending that a reasonable officer could have found probable cause to arrest in this "unusual factual scenario, not well represented in the controlling case law." *Id.,* at 36.

The D. C. Circuit denied rehearing en banc over the dissent of four judges. The dissenters focused on qualified immunity, contending that the panel opinion "contravene[d] . . . emphatic Supreme Court directives" that "police officers may not be held liable for damages unless the officers were 'plainly incompetent' or 'knowingly violate[d]' clearly established law." 816 F. 3d 96, 102 (2016) (quoting *Carroll* v. *Carman,* 574 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 4)). The panel majority—Judges Pillard and Edwards—responded in a joint concurrence. 816 F. 3d, at 96–101. They insisted that the panel opinion did not misapply the law of qualified immunity, and that their disagreement with the dissenters was a mere "case-specific assessment of the circumstantial evidence in the record." *Id.,* at 100.

We granted certiorari to resolve two questions: whether the officers had probable cause to arrest the partygoers, and whether the officers were entitled to qualified immunity. See 580 U. S. ___ (2017). We address each question in turn.

III

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because arrests are "seizures" of "persons," they must be reasonable under the circumstances. See *Payton* v. *New York*, 445 U. S. 573, 585 (1980). A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence. *Atwater* v. *Lago Vista*, 532 U. S. 318, 354 (2001).

To determine whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland* v. *Pringle*, 540 U. S. 366, 371 (2003) (quoting *Ornelas* v. *United States*, 517 U. S. 690, 696 (1996)). Because probable cause "deals with probabilities and depends on the totality of the circumstances," 540 U. S., at 371, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules," *Illinois* v. *Gates*, 462 U. S. 213, 232 (1983). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.*, at 243–244, n. 13 (1983). Probable cause "is not a high bar." *Kaley* v. *United States*, 571 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 18).

A

There is no dispute that the partygoers entered the house against the will of the owner. Nonetheless, the partygoers contend that the officers lacked probable cause to arrest them because the officers had no reason to believe that they "knew or should have known" their "entry was unwanted." *Ortberg* v. *United States*, 81 A. 3d 303, 308 (D. C. 2013). We disagree. Considering the totality of the circumstances, the officers made an "entirely reason-

able inference" that the partygoers were knowingly taking advantage of a vacant house as a venue for their late-night party. *Pringle, supra*, at 372.

Consider first the condition of the house. Multiple neighbors, including a former neighborhood official, informed the officers that the house had been vacant for several months.[4] The house had no furniture, except for a few padded metal chairs and a bare mattress. The rest of the house was empty, save for some fixtures and large appliances. The house had a few signs of inhabitance— working electricity and plumbing, blinds on the windows, toiletries in the bathroom, and food in the refrigerator. But those facts are not necessarily inconsistent with the house being unoccupied. The owner could have paid the utilities and kept the blinds while he looked for a new tenant, and the partygoers could have brought the food and toiletries. Although one woman told the officers that Peaches had recently moved in, the officers had reason to doubt that was true. There were no boxes or other moving supplies in the house; nor were there other possessions, such as clothes in the closet, suggesting someone lived there.

In addition to the condition of the house, consider the partygoers' conduct. The party was still going strong when the officers arrived after 1 a.m., with music so loud that it could be heard from outside. Upon entering the house, multiple officers smelled marijuana.[5] The party-

—————————

[4] At oral argument, the partygoers argued that the house was not formally "vacant" under District law. Tr. of Oral Arg. 34. But a reasonable officer could infer that the complaining neighbors used the term "vacant" in the colloquial, not the legal, sense.

[5] The panel majority dismissed this fact because the officers "did not see any evidence of drugs" and did "not attempt to justify [the] arrests" based on drug use. 765 F. 3d, at 23, n. 5. But a reasonable officer could infer, based on the smell, that marijuana had been used in the house. See *Johnson* v. *United States*, 333 U. S. 10, 13 (1948) (noting that "the odor" of narcotics can "be evidence of the most persuasive character").

goers left beer bottles and cups of liquor on the floor, and they left the floor so dirty that one of them refused to sit on it. The living room had been converted into a make-shift strip club. Strippers in bras and thongs, with cash stuffed in their garter belts, were giving lap dances. Up-stairs, the officers found a group of men with a single, naked woman on a bare mattress—the only bed in the house—along with multiple open condom wrappers and a used condom.

Taken together, the condition of the house and the conduct of the partygoers allowed the officers to make several "'common-sense conclusions about human behavior.'" *Gates*, *supra*, at 231 (quoting *United States* v. *Cortez*, 449 U. S. 411, 418 (1981)). Most homeowners do not live in near-barren houses. And most homeowners do not invite people over to use their living room as a strip club, to have sex in their bedroom, to smoke marijuana inside, and to leave their floors filthy. The officers could thus infer that the partygoers knew their party was not authorized.

The partygoers' reaction to the officers gave them fur-ther reason to believe that the partygoers knew they lacked permission to be in the house. Many scattered at the sight of the uniformed officers. Two hid themselves, one in a closet and the other in a bathroom. "[U]nprovoked flight upon noticing the police," we have explained, "is certainly suggestive" of wrongdoing and can be treated as "suspicious behavior" that factors into the totality of the circumstances. *Illinois* v. *Wardlow*, 528 U. S. 119, 124–125 (2000). In fact, "deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia of *mens rea*." *Sibron* v. *New York*, 392 U. S. 40, 66 (1968) (emphasis added). A reasonable officer could

—————

And the officers could consider the drug use inside the house as evi-dence that the partygoers knew their presence was unwelcome.

infer that the partygoers' scattering and hiding was an indication that they knew they were not supposed to be there.

The partygoers' answers to the officers' questions also suggested their guilty state of mind. When the officers asked who had given them permission to be there, the partygoers gave vague and implausible responses. They could not say who had invited them. Only two people claimed that Peaches had invited them, and they were working the party instead of attending it. If Peaches was the hostess, it was odd that none of the partygoers mentioned her name. Additionally, some of the partygoers claimed the event was a bachelor party, but no one could identify the bachelor. The officers could have disbelieved them, since people normally do not throw a bachelor party without a bachelor. Based on the vagueness and implausibility of the partygoers' stories, the officers could have reasonably inferred that they were lying and that their lies suggested a guilty mind. Cf. *Devenpeck* v. *Alford*, 543 U. S. 146, 149, 155–156 (2004) (noting that the suspect's "untruthful and evasive" answers to police questioning could support probable cause).

The panel majority relied heavily on the fact that Peaches said she had invited the partygoers to the house. But when the officers spoke with Peaches, she was nervous, agitated, and evasive. Cf. *Wardlow*, *supra*, at 124 (explaining that the police can take a suspect's "nervous, evasive behavior" into account). After initially insisting that she had permission to use the house, she ultimately confessed that this was a lie—a fact that the owner confirmed. Peaches' lying and evasive behavior gave the officers reason to discredit everything she had told them. For example, the officers could have inferred that Peaches lied to them when she said she had invited the others to the house, which was consistent with the fact that hardly anyone at the party knew her name. Or the officers could

have inferred that Peaches told the partygoers (like she eventually told the police) that she was not actually renting the house, which was consistent with how the partygoers were treating it.

Viewing these circumstances as a whole, a reasonable officer could conclude that there was probable cause to believe the partygoers knew they did not have permission to be in the house.

B

In concluding otherwise, the panel majority engaged in an "excessively technical dissection" of the factors supporting probable cause. *Gates*, 462 U. S., at 234. Indeed, the panel majority failed to follow two basic and well-established principles of law.

First, the panel majority viewed each fact "in isolation, rather than as a factor in the totality of the circumstances." *Pringle*, 540 U. S., at 372, n. 2. This was "mistaken in light of our precedents." *Ibid.* The "totality of the circumstances" requires courts to consider "the whole picture." *Cortez*, *supra,* at 417. Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation. See *United States* v. *Arvizu*, 534 U. S. 266, 277–278 (2002). Instead of considering the facts as a whole, the panel majority took them one by one. For example, it dismissed the fact that the partygoers "scattered or hid when the police entered the house" because that fact was "not sufficient *standing alone* to create probable cause." 765 F. 3d, at 23 (emphasis added). Similarly, it found "nothing in the record suggesting that the condition of the house, *on its own*, should have alerted the [partygoers] that they were unwelcome." *Ibid.* (emphasis added). The totality-of-the-circumstances test "precludes this sort of divide-and-conquer analysis." *Arvizu*, 534 U. S., at 274.

Second, the panel majority mistakenly believed that it

could dismiss outright any circumstances that were "susceptible of innocent explanation." *Id.,* at 277. For example, the panel majority brushed aside the drinking and the lap dances as "consistent with" the partygoers' explanation that they were having a bachelor party. 765 F. 3d, at 23. And it similarly dismissed the condition of the house as "entirely consistent with" Peaches being a "new tenant." *Ibid.* But probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. As we have explained, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates*, 462 U. S., at 244, n. 13. Thus, the panel majority should have asked whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a "substantial chance of criminal activity." *Ibid.*

The circumstances here certainly suggested criminal activity. As explained, the officers found a group of people who claimed to be having a bachelor party with no bachelor, in a near-empty house, with strippers in the living room and sexual activity in the bedroom, and who fled at the first sign of police. The panel majority identified innocent explanations for most of these circumstances in isolation, but again, this kind of divide-and-conquer approach is improper. A factor viewed in isolation is often more "readily susceptible to an innocent explanation" than one viewed as part of a totality. *Arvizu, supra*, at 274. And here, the totality of the circumstances gave the officers plenty of reasons to doubt the partygoers' protestations of innocence.

For all of these reasons, we reverse the D. C. Circuit's holding that the officers lacked probable cause to arrest. Accordingly, the District and its officers are entitled to

summary judgment on all of the partygoers' claims.[6]

## IV

Our conclusion that the officers had probable cause to arrest the partygoers is sufficient to resolve this case. But where, as here, the Court of Appeals erred on both the merits of the constitutional claim and the question of qualified immunity, "we have discretion to correct its errors at each step." *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 735 (2011); see, *e.g., Plumhoff* v. *Rickard*, 572 U. S. \_\_\_ (2014). We exercise that discretion here because the D. C. Circuit's analysis, if followed elsewhere, would "undermine the values qualified immunity seeks to promote." *al-Kidd*, *supra*, at 735.[7]

### A

Under our precedents, officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Reichle* v. *Howards*, 566 U. S. 658, 664 (2012). "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. *al-Kidd*, *supra,* at 741 (quoting *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987)). In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *al-Kidd*, *supra*, at 741. This demanding standard protects "all but the plainly

----

[6] The partygoers do not contest that the presence of probable cause defeats all of their claims.

[7] We continue to stress that lower courts "should think hard, and then think hard again," before addressing both qualified immunity and the merits of an underlying constitutional claim. *Camreta* v. *Greene*, 563 U. S. 692, 707 (2011). We addressed the merits of probable cause here, however, because a decision on qualified immunity alone would not have resolved all of the claims in this case.

incompetent or those who knowingly violate the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter* v. *Bryant*, 502 U. S. 224, 228 (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at 741–742 (quoting *Wilson* v. *Layne*, 526 U. S. 603, 617 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. See *Reichle*, 566 U. S., at 666. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001). This requires a high "degree of specificity." *Mullenix* v. *Luna*, 577 U. S. ___, ___ (2015) (*per curiam*) (slip op., at 6). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra,* at ___–___ (slip op., at 12–13) (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted . . . constitute[d]

probable cause.'" *Mullenix*, *supra,* at \_\_\_ (slip op., at 6) (quoting *Anderson*, *supra*, at 640–641; some alterations in original).

We have stressed that the "specificity" of the rule is "especially important in the Fourth Amendment context." *Mullenix, supra*, at \_\_\_ (slip op., at 5). Probable cause "turn[s] on the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." *Gates*, 462 U. S., at 232. It is "incapable of precise definition or quantification into percentages." *Pringle*, 540 U. S., at 371. Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in "the precise situation encountered." *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 28). Thus, we have stressed the need to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White* v. *Pauly*, 580 U. S. \_\_\_, \_\_\_ (2017) (*per curiam*) (slip op., at 6); *e.g., Plumhoff, supra,* at \_\_\_. While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." *al-Kidd*, *supra*, at 741. Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Brosseau* v. *Haugen*, 543 U. S. 194, 199 (2004) (*per curiam*). But "a body of relevant case law" is usually necessary to "'clearly establish' the answer" with respect to probable cause. *Ibid.*

Under these principles, we readily conclude that the officers here were entitled to qualified immunity. We start by defining "the circumstances with which [the officers] w[ere] confronted." *Anderson*, 483 U. S., at 640. The officers found a group of people in a house that the neighbors had identified as vacant, that appeared to be vacant, and that the partygoers were treating as vacant. The

group scattered, and some hid, at the sight of law enforcement. Their explanations for being at the house were full of holes. The source of their claimed invitation admitted that she had no right to be in the house, and the owner confirmed that fact.

Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Id.*, at 641. Tellingly, neither the panel majority nor the partygoers have identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation "under similar circumstances." *Pauly*, *supra*, at ___ (slip op., at 6). And it should go without saying that this is not an "obvious case" where "a body of relevant case law" is not needed. *Brosseau*, *supra*, at 199. The officers were thus entitled to qualified immunity.

B

The panel majority did not follow this straightforward analysis. It instead reasoned that, under clearly established District law, a suspect's "good purpose and bona fide belief of her right to enter" vitiates probable cause to arrest her for unlawful entry. 765 F. 3d*,* at 26–27. The panel majority then concluded—in a two-sentence paragraph without any explanation—that the officers must have known that "uncontroverted evidence of an invitation to enter the premises would vitiate probable cause for unlawful entry." *Id.*, at 27. By treating the invitation as "uncontroverted evidence," the panel majority assumed that the officers could not infer the partygoers' intent from other circumstances. And by treating the invitation as if it automatically vitiated probable cause, the panel majority assumed that the officers could not disbelieve the partygoers' story.

The rule applied by the panel majority was not clearly established because it was not "settled law." *Hunter*, 502 U. S., at 228. The panel majority relied on a single decision, *Smith* v. *United States*, 281 A. 2d 438 (D. C. 1971).[8] The defendant in *Smith*, who was found trespassing in a locked construction site near midnight, asserted that he was entitled to a jury instruction explaining that a bona fide belief of a right to enter is a complete defense to unlawful entry. *Id.,* at 439–440. The D. C. Court of Appeals affirmed the trial court's refusal to give the instruction because the defendant had not established a "reasonable basis" for his alleged bona fide belief. *Ibid. Smith* does not say anything about whether the officers here could infer from all the evidence that the partygoers knew that they were trespassing.

Nor would it have been clear to every reasonable officer that, in these circumstances, the partygoers' bona fide belief that they were invited to the house was "uncontroverted." The officers knew that the partygoers had entered the home against the will of the owner. And District case law suggested that officers can infer a suspect's guilty state of mind based solely on his conduct.[9] In *Tillman* v.

---

[8] We have not yet decided what precedents—other than our own— qualify as controlling authority for purposes of qualified immunity. See, *e.g., Reichle* v. *Howards*, 566 U. S. 658, 665–666 (2012) (reserving the question whether court of appeals decisions can be "a dispositive source of clearly established law"). We express no view on that question here. Relatedly, our citation to and discussion of various lower court precedents should not be construed as agreeing or disagreeing with them, or endorsing a particular reading of them. See *City and County of San Francisco* v. *Sheehan*, 575 U. S. \_\_\_, \_\_\_, n. 4 (2015) (slip op., at 14, n. 4). Instead, we address only how a reasonable official "could have interpreted" them. *Reichle*, *supra*, at 667.

[9] The officers cited many of these authorities in their opening brief to the Court of Appeals. See Brief for Appellants in No. 12–7127 (CADC), pp. 28–29. Yet the panel majority failed to mention any of them in its analysis of qualified immunity.

*Washington Metropolitan Area Transit Authority*, 695
A. 2d 94 (D. C. 1997), for example, the D. C. Court of
Appeals held that officers had probable cause to believe
the plaintiff knowingly entered the paid area of a subway
station without paying. *Id.,* at 96. The court rejected the
argument that "the officers had no reason to believe that
[the suspect] was 'knowingly' in the paid area" because the
officers "reasonably could have inferred from [the sus-
pect's] undisputed conduct that he had the intent re-
quired." *Ibid.* The court emphasized that officers can rely
on "the ordinary and reasonable inference that people
know what they are doing when they act." *Ibid.* The court
also noted that "it would be an unusual case where the
circumstances, while undoubtedly proving an unlawful
act, nonetheless demonstrated so clearly that the suspect
lacked the required intent that the police would not even
have probable cause for an arrest." *Ibid.* And the fact
that a case is unusual, we have held, is "an important
indication . . . that [the officer's] conduct did not violate a
'clearly established' right." *Pauly*, 580 U. S., at ___ (slip
op., at 7).

Moreover, existing precedent would have given the
officers reason to doubt that they had to accept the party-
goers' assertion of a bona fide belief. The D. C. Court of
Appeals has held that officers are not required to take a
suspect's innocent explanation at face value. See, *e.g.*,
*Nichols* v. *Woodward & Lothrop, Inc.*, 322 A. 2d 283, 286
(1974) (holding that an officer was not "obliged to believe
the explanation of a suspected shoplifter"). Similar prece-
dent exists in the Federal Courts of Appeals, which have
recognized that officers are free to disregard either all
innocent explanations,[10] or at least innocent explanations

---

[10] See, *e.g.*, *Borgman* v. *Kedley*, 646 F. 3d 518, 524 (CA8 2011) ("[An
officer] need not rely on an explanation given by the suspect"); *Cox* v.
*Hainey*, 391 F. 3d 25, 32, n. 2 (CA1 2004) ("A reasonable police officer is

that are inherently or circumstantially implausible.[11] These cases suggest that innocent explanations— even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect.

For these reasons, a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests here. There was no controlling case holding that a bona fide belief of a right to enter defeats probable cause, that officers cannot infer a suspect's guilty state of mind based on his conduct alone, or that officers must accept a suspect's innocent explanation at face value. Indeed, several precedents suggested the opposite. The officers were thus entitled to summary judgment based on qualified immunity.

*　*　*

The judgment of the D. C. Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

—————

not required to credit a suspect's story"); *Marx* v. *Gumbinner*, 905 F. 2d 1503, 1507, n. 6 (CA11 1990) ("[Officers a]re not required to forego arresting [a suspect] based on initially discovered facts showing probable cause simply because [the suspect] offered a different explanation"); *Criss* v. *Kent*, 867 F. 2d 259, 263 (CA6 1988) ("A policeman . . . is under no obligation to give any credence to a suspect's story . . . ").

[11] See *e.g.*, *Ramirez* v. *Buena Park*, 560 F. 3d 1012, 1024 (CA9 2009) (holding that "innocent explanations for [a suspect's] odd behavior cannot eliminate the suspicious facts" and that "law enforcement officers do not have to rule out the possibility of innocent behavior" (internal quotation marks omitted)); *United States* v. *Edwards*, 632 F. 3d 633, 640 (CA10 2001) (holding that probable cause existed where the suspect "offered only implausible, inconsistent explanations of how he came into possession of the money"); *Bradway* v. *Gonzales*, 26 F. 3d 313, 321 (CA2 1994) (holding that "[a] reasonable officer who found the [stolen items], and who heard [the suspect's] implausible explanation for possessing them, would have believed that probable cause existed").

# SUPREME COURT OF THE UNITED STATES

---

No. 15–1485

---

## DISTRICT OF COLUMBIA, ET AL., PETITIONERS *v.* THEODORE WESBY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 22, 2018]

JUSTICE SOTOMAYOR, concurring in part and concurring in the judgment.

I agree with the majority that the officers here are entitled to qualified immunity and, for that reason alone, I concur in the Court's judgment reversing the judgment of the Court of Appeals for the District of Columbia. But, I disagree with the majority's decision to reach the merits of the probable-cause question, which it does apparently only to ensure that, in addition to respondents' 42 U. S. C. §1983 claims, the Court's decision will resolve respondents' state-law claims of false arrest and negligent supervision. See *ante,* at 13, n. 7. It is possible that our qualified-immunity decision alone will resolve those claims. See Reply Brief 20, n. 7. In light of the lack of a dispute on an important legal question and the heavily factbound nature of the probable-cause determination here, I do not think that the Court should have reached that issue. The lower courts are well equipped to handle the remaining state-law claims in the first instance.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1485

_____

## DISTRICT OF COLUMBIA, ET AL., PETITIONERS *v.* THEODORE WESBY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[January 22, 2018]

JUSTICE GINSBURG, concurring in the judgment in part.

This case, well described in the opinion of the Court of Appeals,* leads me to question whether this Court, in assessing probable cause, should continue to ignore why police in fact acted. See *ante,* at 4, n. 2. No arrests of plaintiffs-respondents were made until Sergeant Suber so instructed. His instruction, when conveyed to the officers he superintended, was based on an error of law. Sergeant Suber believed that the absence of the premises owner's consent, an uncontested fact in this case, sufficed to justify arrest of the partygoers for unlawful entry. See App. 60 (Suber deposition) (officers had probable cause to arrest because "Peaches did not have the right, nor did the [party-goers] have the right[,] to be inside that location"). An essential element of unlawful entry in the District of Columbia is that the defendant "knew or should have known that his entry was unwanted." *Ortberg* v. *United States,* 81 A. 3d 303, 308 (D. C. 2013). But under Sergeant Suber's view of the law, what the arrestees knew or should have known was irrelevant. They could be arrested, as he comprehended the law, even if they believed their entry

———————

*The Court's account of the undisputed facts goes beyond those recited by the Court of Appeals. Compare *ante,* at 1–3, with 765 F. 3d 13, 17–18 (CADC 2014).

was invited by a lawful occupant.

Ultimately, plaintiffs-respondents were not booked for unlawful entry. Instead, they were charged at the police station with disorderly conduct. Yet no police officers at the site testified to having observed any activities warranting a disorderly conduct charge. Quite the opposite. The officers at the scene of the arrest uniformly testified that they had neither seen nor heard anything that would justify such a charge, and Sergeant Suber specifically advised his superiors that the charge was unwarranted. See 765 F. 3d 13, 18 (CADC 2014); App. 56, 62–63, 79, 84, 90, 103.

The Court's jurisprudence, I am concerned, sets the balance too heavily in favor of police unaccountability to the detriment of Fourth Amendment protection. A number of commentators have criticized the path we charted in *Whren* v. *United States*, 517 U. S. 806 (1996), and follow-on opinions, holding that "an arresting officer's state of mind . . . is irrelevant to the existence of probable cause," *Devenpeck* v. *Alford*, 543 U. S. 146, 153 (2004). See, *e.g.,* 1 W. LaFave, Search and Seizure §1.4(f), p. 186 (5th ed. 2012) ("The apparent assumption of the Court in *Whren*, that no significant problem of police arbitrariness can exist as to actions taken with probable cause, blinks at reality."). I would leave open, for reexamination in a future case, whether a police officer's reason for acting, in at least some circumstances, should factor into the Fourth Amendment inquiry. Given the current state of the Court's precedent, however, I agree that the disposition gained by plaintiffs-respondents was not warranted by "settled law." The defendants-petitioners are therefore sheltered by qualified immunity.