RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 21-5295

DOMINIQUE MCKENZIE,

*Defendant-Appellant*.

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:19-cr-00064-1—Katherine A. Crytzer, District Judge.

Decided and Filed: May 3, 2022

Before: ROGERS, KETHLEDGE, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Brent N. Jones, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

─────────────

## OPINION

─────────────

MURPHY, Circuit Judge. Federal law makes it a crime for so-called "straw purchasers" to tell licensed firearms dealers that they are buying a firearm for themselves when, in fact, they are buying it for someone else. 18 U.S.C. § 922(a)(6); *Abramski v. United States*, 573 U.S. 169, 179–89 (2014). Straw purchasers sometimes engage in these stealth transactions because the true buyers (for example, felons) cannot buy guns themselves. 18 U.S.C. § 922(g)(1). These types of straw purchases raise heightened safety concerns, so the Sentencing Guidelines instruct

courts to increase a straw purchaser's potential sentence in certain cases if the purchaser had "knowledge" or "reason to believe" that the true buyer could not lawfully possess the firearm. U.S.S.G. § 2K2.1(a)(4)(B).

What does it take for a straw purchaser to have "reason to believe" that the true buyer cannot lawfully possess the gun? This case raises that question. Dominique McKenzie admits that he was a straw purchaser for two individuals but disputes that he had "reason to believe" that they could not possess firearms. We interpret that phrase—one commonly used in the probable-cause context—to require, at most, that a straw purchaser know of facts creating a fair probability that the true buyer could not possess a firearm. And we agree with the district court that McKenzie had knowledge of such facts in this case. We thus affirm its use of this guideline.

I

Between October 2018 and March 2019, McKenzie purchased 13 firearms from several federally licensed dealers in and around Knoxville, Tennessee. By early 2019, his conduct had caught the attention of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). McKenzie's purchases suggested to the agency that he might be a straw purchaser—that is, someone who buys guns for others.

The ATF began to monitor McKenzie. On February 26, 2019, he traveled to Crossroads Firearms to purchase a Glock 27. To obtain this semiautomatic pistol, McKenzie signed a federal form acknowledging that he was not purchasing it for someone else. He then headed straight to a nearby Applebee's parking lot, where officers watched him meet with Lucky Clark. McKenzie gave Clark the Glock 27 in exchange for cash. The next day, officers arrested Clark and seized the newly purchased handgun.

The officers later obtained a search warrant to review the text messages from Clark's phone. These messages revealed discussions between Clark and McKenzie during the week before the purchase. Clark first texted a different person to obtain McKenzie's phone number. After he successfully contacted McKenzie, the pair conversed about the type of handgun that Clark wanted, its anticipated price, and the stores at which McKenzie might buy it. McKenzie also made clear that Clark would have to pay him a $60 purchaser's fee in addition to the

firearm's cost (which ultimately turned out to be $450). The parties never discussed why Clark did not just buy the gun himself.

McKenzie made a second straw purchase a month later. On March 29, he traveled to Shoot Point Blank to buy a Micro Draco, another semiautomatic pistol. McKenzie again signed the form indicating that he was not a straw purchaser, but he could not leave with the gun due to a delay in his background check. After he returned to pick it up the next day, officers watched him travel to a nearby gas station. There, he met Jeffrey Lee Schwartz and gave Schwartz the gun.

Officers conducted a traffic stop of Schwartz as he drove away. They recovered the firearm and some marijuana. While at the scene, Schwartz told officers that McKenzie had bought the gun for him after he had unsuccessfully tried to buy one for himself. As Schwartz spoke with the officers, McKenzie approached on foot. Pretending to still own the gun, McKenzie asked for it back and said that he had given it to Schwartz for safekeeping after a burglary at his home. McKenzie denied selling the gun to Schwartz.

Two days later, ATF agents interviewed Schwartz about these events. Schwartz explained that he knew McKenzie only from seeing him at nightclubs but had heard that McKenzie would buy a gun for anyone. Schwartz had initially contacted McKenzie in January 2019 about purchasing a handgun for Schwartz after he received his tax refund. The day before the March 29 purchase, Schwartz had reconnected with McKenzie on Snapchat while traveling to a gun store himself. Schwartz told the ATF agents that he asked McKenzie: "if for some reason I am denied from purchasing the firearm or cannot purchase the firearm for some other reason can you help me?" Rep., R.127-1, PageID 976. McKenzie agreed. When Tennessee's background-check system alerted the store not to sell to Schwartz, he declined his right to appeal. Schwartz instead asked McKenzie to buy a gun for him, and the two arranged the logistics of the purchase. Schwartz told the agents that he had paid McKenzie $850 in the early morning hours of March 30 before McKenzie returned to the store to pick up the gun. Although McKenzie never mentioned a purchaser's fee expressly, the amount Schwartz gave him exceeded the cost of the gun by about $20. As with Clark, McKenzie does not appear to have

asked Schwartz why he could not buy the gun himself.  Schwartz later told officers that the store likely refused to sell him a gun because his driver's license had listed his old address.

For these two transactions, the government charged McKenzie with two counts of making a materially false statement to a licensed firearms dealer by suggesting that he was the actual buyer when he was a straw purchaser.  *See* 18 U.S.C. § 922(a)(6).  McKenzie pleaded guilty to both counts without a plea agreement.

A probation officer calculated McKenzie's guidelines range using the firearms guideline.  *See* U.S.S.G. § 2K2.1.  The applicable subparagraph of this guideline instructs courts to choose a higher base offense level if, as relevant here, three conditions are met.  *Id.* § 2K2.1(a)(4)(B).  The offense must involve a semiautomatic firearm capable of accepting a large-capacity magazine.  *Id.* § 2K2.1(a)(4)(B)(i)(I).  The defendant must have been convicted under § 922(a)(6).  *Id.* § 2K2.1(a)(4)(B)(ii)(III).  And the defendant must have "committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person[.]"  *Id.*  McKenzie objected to the court's use of this provision in calculating his guidelines range, asserting that he had no reason to think that Clark or Schwartz were "prohibited person[s]."

Overruling McKenzie's objection, the district court found that he had reason to believe that Clark and Schwartz were prohibited persons.  The court noted that McKenzie never asked Clark why he could not buy the gun himself and required Clark to pay a $60 fee.  It found even "more impactful" that Schwartz had alerted McKenzie to the possibility that he would be denied the right to purchase a firearm himself.  Sent. Tr., R.126, PageID 940.

Using the higher base offense level, the court calculated McKenzie's guidelines range as 30 to 37 months' imprisonment.  It imposed a 30-month sentence.

II

McKenzie asserts that the district court miscalculated his guidelines range by using the base offense level in U.S.S.G. § 2K2.1(a)(4)(B) and thereby imposed a procedurally

unreasonable sentence. *See United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). This subparagraph instructs a district court to set a defendant's base offense level at "20, if":

> the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine . . . and (ii) defendant . . . (III) is convicted under 18 U.S.C. § 922(a)(6) . . . and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person[.]

U.S.S.G. § 2K2.1(a)(4)(B). The corresponding commentary goes on to define "prohibited person" as someone "described in 18 U.S.C. § 922(g) or § 922(n)"—statutory subsections that bar various individuals (including convicted felons and those indicted for a felony) from possessing firearms. *Id.* cmt. n.3.

The parties agree on (or at least do not expressly dispute) several points about this subparagraph's application. They agree that the government bore the burden of proof to establish its applicability by a preponderance of evidence. *Cf. United States v. Pawlak*, 822 F.3d 902, 911 (6th Cir. 2016), *abrogated on other grounds by Beckles v. United States*, 137 S. Ct. 886 (2017). They also do not object to the evidence on which the district court relied to find this burden met, including records of Clark's text messages, ATF notes of the interview with Schwartz, the basic facts to which McKenzie pleaded guilty, and the information in his presentence report. *Cf. United States v. Cover*, 800 F.3d 275, 278 (6th Cir. 2015) (per curiam). McKenzie next agrees that the government satisfied two of the subparagraph's three requirements: that he was convicted under § 922(a)(6) and that his offense involved a semiautomatic firearm that could accept a large-capacity magazine. The government likewise agrees that the evidence did not show that McKenzie had "knowledge" that Clark or Schwartz could not possess firearms or an "intent" to provide those individuals with guns because of their prohibited status. The parties' dispute thus boils down to whether the government showed that McKenzie had "reason to believe that the offense would result in the transfer of a firearm . . . to a prohibited person[.]" U.S.S.G. § 2K2.1(a)(4)(B)(ii)(III).

Our answer must start with a basic understanding of what the phrase "reason to believe" means. Under standard definitions, a straw purchaser must have a "basis" or "cause" to "think" or "suppose" that the true buyer cannot possess the firearm. *Random House Webster's*

*Dictionary* 61, 550 (2d ed. 1996) (defining "reason" and "believe"). As with many interpretive questions, though, these definitions (mere synonyms, really) do not give much guidance on the critical question: how much information must a defendant know about the true buyer to create a sufficient "basis" or "cause" to conclude that the buyer is a prohibited person? *Cf. United States v. Hill*, 963 F.3d 528, 532–33 (6th Cir. 2020).

Placing this phrase in its relevant context sheds more light on that question. *See id.* Two contextual clues—one structural, the other historical—demonstrate the amount of information that the guideline requires. To begin with, we must interpret this phrase against the guideline as a whole. *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007). Notably in that respect, the subparagraph also applies to straw purchasers who have "knowledge" that a true buyer cannot possess firearms or who have the "intent" to engage in the purchase because of that fact. U.S.S.G. § 2K2.1(a)(4)(B)(ii)(III). This structure leaves no doubt that the Sentencing Commission added "reason to believe" to expand the guideline's scope by covering more than just purchasers who act with "intent" or "knowledge." We thus must not interpret the phrase "reason to believe" to require a straw purchaser to know so much about a true buyer that one could describe the purchaser as having "knowledge" of the buyer's status. Such a reading would render the phrase a nullity.

Not only that, the typical "ostrich" instruction clarifies that a party can have "knowledge" of something if the party deliberately avoids learning of it. *See United States v. Matthews*, __ F.4th __, 2022 WL 1077872, at *6 (6th Cir. Apr. 11, 2022). Think of the "drug mule" who gets paid to drive a car filled with packages in deliberate ignorance of what is in them. *Cf. United States v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998). That driver does not just have a "reason to believe" of the illegal drug distribution, but "knowledge" of it too. So "reason to believe" must also require less than this deliberate avoidance of knowledge—which would satisfy the "knowledge" element.

Yet what amount of information below this level must the straw purchaser possess? A review of the manner in which courts have used the phrase "reason to believe" sheds further light on this question. *Cf. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006). Courts have long equated "reason to believe" either with the traditional probable-cause

standard (which requires a "probability or substantial chance" of something) or with an even lower standard. *District of Columbia v. Wesby*, 138 S. Ct. 577, 586–87 (2018) (citation omitted); *see Rojas v. Garland*, 998 F.3d 847, 850 (8th Cir. 2021); *United States v. Vasquez-Algarin*, 821 F.3d 467, 477–78 & 478 n.16 (3d Cir. 2016); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980).

Two examples demonstrate this historical usage. For one thing, the Supreme Court has held that officers can enter the home of a person subject to an arrest warrant if the officers have "reason to believe" that the person is inside. *Payton v. New York*, 445 U.S. 573, 603 (1980). The circuit courts have long debated whether this "reason to believe" test is analogous to the traditional probable-cause test or to a lower standard such as reasonable suspicion. *See United States v. Baker*, 976 F.3d 636, 642 (6th Cir. 2020); *compare Vasquez-Algarin*, 821 F.3d at 477–80, *with United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005). But no court has held that it requires something more than probable cause. For another thing, in the famous case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Court held that an officer may conduct a pat-down search for weapons if the officer has "reason to believe" that an individual is "armed and dangerous[.]" *Id.* at 27. This standard does not require the officer to be "absolutely certain" that a suspect is armed; it requires only a reasonable belief that the suspect is. *Id.*

All told, this evidence shows that the phrase "reason to believe" is generally interpreted to require nothing more than what the "probable cause" test traditionally has required. A straw purchaser must know of facts that, at most, create a "fair probability" that the buyer is a prohibited person. *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). That is not a "high bar." *Wesby*, 138 S. Ct. at 586 (citation omitted). If anything, the phrase could be read (as it has been) to require something less than the probable-cause test. But we need not answer that question to resolve this case.

This understanding of "reason to believe" comports with our precedent on the topic. Although we have not interpreted the phrase "reason to believe" in § 2K2.1(a)(4)(B), the guidelines use that phrase elsewhere. Among other provisions, a firearm-trafficking enhancement applies if the defendant had "reason to believe" either that the recipient could not possess a firearm or that the firearm would be used for unlawful purposes.

U.S.S.G. § 2K2.1(b)(5) & cmt. n.13(A)(ii). When applying this guideline, our cases have used probable-cause logic. We have noted, for example, that the true buyer (for example, an undercover ATF agent) need not *actually* be a prohibited person so long as the defendant learned of facts that created a substantial likelihood that he was (for example, the undercover agent's statement that he was a convicted felon). *See Pawlak*, 822 F.3d at 912–13; *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016); *cf. Wesby*, 138 S. Ct. at 586. (It turns out in this case that Clark was a "prohibited person," but Schwartz was not.)

We have also looked to the same "common-sense" factors on which courts have long relied for probable-cause purposes. *See Pawlak*, 822 F.3d at 912 (quoting *United States v. Juarez*, 626 F.3d 246, 256 (5th Cir. 2010)); *cf. Wesby*, 138 S. Ct. at 587. So a seller had a sufficient reason to believe that a buyer could not lawfully possess firearms when the parties transacted in secret, the buyer agreed to a substantial mark-up from the market price, and the buyer told the seller that he had left the "truck running" in case something went wrong. *Pawlak*, 822 F.3d at 912. Likewise, a seller had reason to believe that the buyer would use a firearm for an unlawful purpose when the buyer was his heroin dealer. *See United States v. Freeman*, 640 F.3d 180, 189 (6th Cir. 2011); *see also United States v. Torres*, 644 F. App'x 663, 667 (6th Cir. 2016).

Cases from other circuits also support this interpretation because they have looked to the same common-sense factors. In one case, for example, a straw purchaser had bought some 25 firearms (primarily semiautomatic rifles) for the same recipient over 13 months. *Juarez*, 626 F.3d at 249. The Fifth Circuit held that the straw purchaser had "reason to believe" that the recipient would use the guns unlawfully because, among other things, the recipient had approached her secretively without disclosing more than a nickname, had paid her a substantial purchaser's fee, and had refused to buy the guns himself or be "associated with the transactions." *Id.* at 252. Likewise, the Eleventh Circuit held that a seller had "reason to believe" that firearms would be used unlawfully when the purchaser intended to resell them and told the seller that he would spend the proceeds on a tattoo parlor "to make it look legit"—a statement implying that illegal activity was afoot. *United States v. Grinnage*, 309 F. App'x 334, 336 (11th Cir. 2009) (per curiam); *see also, e.g.*, *United States v. Asante*, 782 F.3d 639, 644–46 (11th Cir. 2015);

*United States v. Melvin*, 463 F. App'x 141, 147 (3d Cir. 2012); *United States v. Fox*, 137 F.3d 527, 531 (7th Cir. 1998).

Under this interpretation, the district court properly applied the guideline in this case. At the outset, we must consider a standard-of-review question. The parties do not really dispute the "historical" facts about McKenzie's background knowledge of, and interactions with, Clark and Schwartz. Rather, they dispute whether those historical facts created the necessary "reason to believe." Should we review this question de novo or under a deferential clear-error standard? *Cf. United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019). Some courts have used the clear-error test, pointing out that a related issue (whether a defendant had "knowledge" that the recipient could not possess firearms) is undoubtedly a question of fact. *See, e.g.*, *Juarez*, 626 F.3d at 251–52. Others have suggested that we should treat this question as "mixed" and review it de novo, a conclusion that would comport with how appellate courts review whether probable cause exists. *See Pawlak*, 822 F.3d at 911; *see also Ornelas v. United States*, 517 U.S. 690, 696–97 (1996). In the end, we need not choose a standard of review because, even under de novo review, the district court properly found that McKenzie had reason to believe that Clark and Schwartz were prohibited persons.

We begin with a big-picture point. According to Schwartz, McKenzie had become well known in Knoxville as a person who would buy a gun "for whoever wanted one." Rep., R.127-1, PageID 975. His purchases of 13 guns in a six-month window lends credence to this belief. PSR, R.117, PageID 735–36. The evidence also shows that McKenzie did not know Clark or Schwartz particularly well. Clark had to track down McKenzie's phone number from a different person. Schwartz stated that he knew McKenzie only through the "nightclub scene" and did not spend time with him elsewhere. Rep., R.127-1, PageID 975. Even though Clark and Schwartz were at most acquaintances of McKenzie, they nevertheless requested that he buy them a gun. That is an odd request. One obvious inference as to why they might make it is because the law prohibited them from purchasing the gun themselves—that is, because they were "prohibited person[s]." U.S.S.G. § 2K2.1(a)(4)(B).

Despite this risk, McKenzie did not ask Clark or Schwartz a single question about why they wanted him to buy a gun for them. He did not make this most basic of inquiries even

though they were asking him to commit a crime by telling the firearms dealers that he was buying a firearm for himself when, in fact, he was purchasing it for them.  *See* 18 U.S.C. § 922(a)(6); *Abramski*, 573 U.S. at 179–89.  His failure to ask any questions despite the obvious risk involved could suggest that McKenzie was intentionally sticking his head in the sand to avoid the truth—a fact that could show his deliberate avoidance of knowledge.  *See Matthews*, 2022 WL 1077872, at *6; *cf. United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986).  Even if these background facts did not create a sufficient enough risk to prove deliberate avoidance (as the government recognizes by conceding that McKenzie lacked knowledge), they likely created a "substantial chance" that Clark or Schwartz could not lawfully possess firearms.  *Wesby*, 138 S. Ct. at 586 (citation omitted).

But there is more.  Specific details about each transaction confirm this "common-sense" notion.  *Pawlak*, 822 F.3d at 912 (citation omitted).  Many cases recognize that a decision to pay a premium for a firearm can suggest that the buyer cannot possess the firearm or intends to use it for unlawful purposes.  *See, e.g.*, *id.*; *Juarez*, 626 F.3d at 252.  Why else would a rational buyer agree to pay more than the market price?  And here, Clark agreed to pay McKenzie a fee of $60 for the purchase, representing over a 10% markup from the $450 price.  McKenzie even told Clark that he could always use a friend or significant other to buy the firearm if he did not want to pay the fee.  That Clark proceeded with the transaction anyway reinforces the impression that he was forced to rely on McKenzie (and to pay the fee) because he could not lawfully possess firearms.

McKenzie earned a smaller profit on the sale to Schwartz (about $20), and those two never expressly discussed any purchaser's fee (as far as the record shows).  But we need not rest our conclusion on that aspect of the second transaction because of a different piece of evidence.  Courts have also often relied on a buyer's "red flag" statements when concluding that the defendant had a reason to believe that the buyer could not possess weapons or intended to use them unlawfully.  *See, e.g.*, *Grinnage*, 309 F. App'x at 336; *Fox*, 137 F.3d at 531.  Schwartz made one such remark in this case.  While on his way to purchase a gun himself, he disclosed to McKenzie that he might get "denied" the ability to buy the gun or be unable to purchase it for "some other reason[.]"  Rep., R.127-1, PageID 976.  McKenzie later learned that Schwartz had

failed to successfully buy a gun on this occasion, which is why Schwartz followed up with him asking for help. *Id.* Schwartz's statements all but eliminate most of the "innocent" explanations that McKenzie raises on appeal as to why someone might ask another to be a straw purchaser—convenience, lack of familiarity, or a hesitancy to appear in a government database. Schwartz's efforts to buy the gun himself show that he asked for McKenzie's help for none of these reasons. His statements thus increased the risk even further that Schwartz could not lawfully possess a gun.

McKenzie's counterarguments do not persuade us otherwise. He correctly points out that the government presented stronger evidence in most of the decisions that we have cited. Yet none of these decisions notes (or even implies) that their facts establish any sort of floor for what qualifies as a sufficient "reason to believe." Indeed, many of them did not even distinguish between "knowledge" and "reason to believe," suggesting that the defendants in the cases might well have acted with the higher "knowledge" mens rea. *See, e.g.*, *United States v. Lumpkin*, 677 F. App'x 992, 994–95 (6th Cir. 2017); *Juarez*, 626 F.3d at 252. Another case cited by McKenzie also mentioned this issue only in passing because the defendant did not raise it on appeal. *See United States v. Sacus*, 784 F.3d 1214, 1217–18 (8th Cir. 2015).

McKenzie next reiterates his point that true buyers might ask straw purchasers to buy them a gun for "innocent" reasons—such as a desire to use the straw purchaser's right to a discount on the price or a fear of having the buyer's name in a government database. McKenzie argues that the government cannot establish that a defendant had a "reason to believe" that the true buyer cannot possess the firearm unless the evidence affirmatively rules out these other possibilities. McKenzie adds that the government's evidence in this case did not do so. But he overreads the phrase "reason to believe." Just as with the probable-cause test, suspicious facts can create a sufficient reason to believe that the true buyer cannot lawfully possess a firearm even if those facts might have an "innocent explanation" too. *See Wesby*, 138 S. Ct. at 588. McKenzie's contrary interpretation would all but equate "reason to believe" with "knowledge" and effectively eliminate the former phrase from the guideline.

We affirm.