**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 18a0438n.06**

**No. 17-3873**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EFFIE J. STILLWAGON, Executor of the Estate for James R. Stillwagon, | ) | **FILED** |
| | ) | Aug 24, 2018 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF DELAWARE, OHIO; RICHARD O. MATTINGLY, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Defendants, | ) | |
| | ) | |
| ADAM WILLAUER, Officer; JONATHAN RADABAUGH, Detective Sergeant; JAMES AILES, Officer; JASON FLYNN, Officer; BENJAMIN SEGAARD, Detective; PATRICK GERKE, Former Detective, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**BEFORE:** BOGGS and GRIFFIN, Circuit Judges; and HOOD, District Judge.[*]

**BOGGS, Circuit Judge**. This is a 42 U.S.C. § 1983 civil-rights case brought by plaintiff-appellee, James R. Stillwagon, against multiple municipal defendants, including the City of Delaware, Ohio, and six Delaware police officers/detectives in their individual capacities—Detective Segaard, former Detective Gerke, Sergeant Detective Radabaugh, and Officers Ailes, Flynn and Willauer—for false arrest, malicious prosecution, excessive force, civil

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

conspiracy, supervisory liability, and related Ohio state-law claims. Defendants moved for summary judgment, arguing they were immune from liability. The district court held that defendants did not have federal or state-law immunity and denied their motions for summary judgment. Defendants appealed. For the reasons set forth below, we affirm the district court's holding that defendants are not entitled to qualified immunity and dismiss defendants' appeal of the district court's denial of statutory immunity as to Stillwagon's related state-law claims.

I

This case arises from a vehicular assault event that occurred over a 15-mile span on state highways around Delaware, Ohio, in 2012. James Stillwagon[1] was one of Ohio State University's most famous and decorated football stars.[2] His celebrity status was relevant to how his case was handled and was included in lead investigator Detective Segaard's incident report submitted to the grand jury, where Segaard noted that this case had garnered national attention because of Stillwagon's fame and the violent nature of his alleged crime.

On Sunday, September 30, 2012, 63-year-old Stillwagon was travelling from Dublin, Ohio to visit his parents' gravesite in North Vernon, Ohio. Stillwagon was riding his BMW motorcycle, heading northeast on U.S. Route 42 toward Delaware, Ohio. About 10 miles south of Delaware, Stillwagon stopped to get gas at a Marathon Station near the intersection of U.S. Route 42 and State Road 33. Richard Mattingly, 41, who was driving a silver 2005 Dodge Ram pickup truck,

---

[1] James R. Stillwagon died on February 4, 2018. By order of the court, Effie Stillwagon, Executor for James Stillwagon, has replaced him as the appellee. All references herein to Stillwagon will be to James Stillwagon.

[2] A defensive lineman and a three-year starter (1968-1970), Stillwagon led the undefeated Buckeyes to a national championship (1968) and won both the prestigious Lombardi Award and Outland Trophy in 1970.

stopped at the same gas station. Mattingly said he had been drinking beer at home, was continuing to drink in the truck, and had stopped to buy beer and cigarettes. Stillwagon and Mattingly left the gas station at the same time, with Stillwagon leaving first and Mattingly leaving directly behind him. Then, according to the district court and taken in the light most favorable to the plaintiff, the following events occurred.

Just northeast of the gas station, Route 42 narrows from four to two lanes. As Stillwagon approached the merger, Mattingly sped past Stillwagon, laying down rubber and nearly hitting him. After driving two more miles, Mattingly stopped his truck, half on the road and half on the berm. As Stillwagon approached on his motorcycle, Mattingly was waving a blue baseball bat out the driver-side window of his truck, signaling for Stillwagon to go around him. Instead, Stillwagon stopped and waited for Mattingly to leave, which he did. A little further up the road, Mattingly again stopped and did the same thing, waving the bat out his window signaling Stillwagon to go in front of him. Stillwagon again stopped and waited until Mattingly sped off.

After Mattingly left, Stillwagon continued north on Route 42 when he came upon Mattingly who had gotten behind a slow car. Stillwagon passed both vehicles. In response, Mattingly raced north on the southbound lane, pushing at least one car off the road. As they approached the Watkins Road traffic light, Mattingly cut in three times toward Stillwagon's bike, forcing Stillwagon to brake hard and skid off onto the shoulder, and just miss hitting Mattingly. Mattingly ran the red light and sped north on Route 42.

Stillwagon stopped at the red light and, after it turned green, pulled off the side of the road immediately north of the Watkins Road intersection. His intent was to distance himself from Mattingly. Stillwagon, who was carrying a licensed firearm, removed it from his bag and put it in

his jacket for protection if Mattingly came back and tried to run him over. A witness, Ruth Sayre, stated she saw Mattingly chase and cut in on Stillwagon near Watkins Road. Another witness, Lois Reninger, stated that she saw Mattingly pass and then "brake check" Stillwagon and that she and an unidentified man stopped to check on Stillwagon when he pulled off the road.

Stillwagon asked the man to call the police, which he did. The police said that Stillwagon could wait by the side of the road for an officer to come take a report, but they did not know how soon they could get there. After several minutes, and not having any idea how long the wait would be, Stillwagon got back on his motorcycle and continued on his way, north on Route 42.

Stillwagon drove nearly 4 miles without incident. But as Stillwagon crossed the intersection of Section Line Road, Stillwagon saw Mattingly pull back onto Route 42, about five to six cars behind him. Mattingly proceeded to pass all the cars, going north on the southbound lane, forcing two southbound cars off the road. Kevin Cogan testified that he and his young son were forced to drive off the road to avoid a head-on collision with Mattingly's truck. Mattingly pulled in behind Stillwagon and tried to ram the back of his motorcycle. Stillwagon accelerated to 85 miles per hour to avoid being hit. Mattingly again approached the bike from the southbound lane, cutting in front of Stillwagon, who had to brake hard to avoid crashing. Both vehicles came to a stop and then Mattingly drove away.

About 2 ½ miles north of Section Line Road, U.S. Route 42 merges with U.S. Route 23, becoming Columbus Pike. As Stillwagon approached Columbus Pike, he saw Mattingly stopped at a green traffic light and then saw Mattingly eventually continue onto Columbus Pike. Stillwagon stayed back 2 traffic lights and waited before continuing onto Columbus Pike. About 1 mile later, Stillwagon got in the right exit lane for the William Street exit. This exit lane forms its own mile-

long lane on Columbus Pike. Stillwagon then spotted Mattingly, who was driving very slowly, approximately 10 mph, in the left through lane. At the last moment, Mattingly swerved from the left lane just in front of the concrete barrier at the top of the exit ramp. He was in front of Stillwagon, again. As Stillwagon exited, he saw Mattingly stopped at the bottom of the exit ramp. Stillwagon stopped about 50 yards back from the truck. Mattingly then put his truck in reverse, backing his truck directly toward Stillwagon. Stopped on the exit ramp between a concrete wall on the left and a rocky ledge on the right, Stillwagon took out his gun and fired three shots at the truck's tailgate. Mattingly stopped and raced away, turning right onto William Street.

After again waiting, Stillwagon eventually continued and turned right off the exit ramp. He immediately saw Mattingly's truck parked on the Olentangy River bridge, straddling both eastbound lanes. At the near end of the bridge, Stillwagon saw an Auto Zone parking lot with a concrete pillar near the front of the parking lot. Stillwagon drove toward the parking lot, hoping to use the pillar for protection. Mattingly sped his truck into the parking lot, revving his engine. Stillwagon feared that Mattingly was going to try to maneuver around to the other side of the pillar where Stillwagon was unprotected. Stillwagon fired two rounds at the truck's rear driver-side tire.

Mattingly then exited the Auto Zone parking lot, but instead of leaving, he circled back into the lot and drove directly at Stillwagon. Stillwagon fired a shot into the truck's engine. The truck came to a stop about 10 feet from Stillwagon. Stillwagon walked toward the truck and approached as Mattingly jumped out of his truck. Stillwagon grabbed Mattingly by the shoulder, kicked him in the knee, and then hit him on the back of his head with his pistol, at which point the pistol discharged upward into the sky. Stillwagon put his gun down and asked a bystander to call the police.

II

Dispatch reported shots fired. The first officer to arrive on scene was Delaware County Deputy Sheriff Pitts. He saw Mattingly lying on the ground with blood on his head. Pitts asked who had fired the weapon and Stillwagon acknowledged that he had fired the weapon but explained that Mattingly had just tried to kill him six times. Stillwagon was arrested without incident. He complied with Deputy Pitts's instructions to lie on the ground and did not resist when he was double cuffed behind his back. Delaware Police Department Detective Ailes then took charge of Stillwagon and physically pushed him into the back seat of a police cruiser, slamming the door on his feet, leaving him lying on his stomach in the back of the cruiser for nearly half an hour. Stillwagon's excessive force claim against Detective Ailes arises from this incident, which will be discussed in greater detail when we address this claim.

The officers attending Mattingly at the scene reported that he was talking and that he had only suffered a grazing head wound. Per shot-fired protocol, a medical helicopter already had been dispatched, so it transported Mattingly to the Ohio State University Hospital. At the hospital, Mattingly did not recall being shot and reported that he was "hit in the head." Without being discharged, Mattingly left the hospital with his wife. Mattingly, who had been convicted of shaking and killing his infant son and recently been paroled, smelled of alcohol, and did not want to be found in violation of his parole for drinking and driving.

In the cruiser, Stillwagon told Detective Ailes what had happened, an account that was consistent with facts as set forth above. Stillwagon was then transported to the Delaware police station by Officer Flynn. During booking, Officer Flynn was ordered to take steps to preserve gunshot residue on Stillwagon's hands. Flynn put plastic "evidence" bags over Stillwagon's

hands. He secured the bags using police tape, which he wrapped around Stillwagon's wrists "tourniquet tight," so tight that Stillwagon "could hardly feel" his hands. This incident will be discussed in greater detail when we address Stillwagon's excessive force claim against Officer Flynn.

Detectives Segaard and Gerke interviewed Stillwagon at the police station. The district court found that Stillwagon's interview story was consistent with the facts set forth above and with what he told Officer Ailes in the police cruiser. The district court noted that Segaard and Gerke testified that they found Stillwagon's statement to be credible. In addition, Segaard and Gerke learned during the interview, through text messages with other officers, that the location of four of the five bullet holes in Mattingly's truck was consistent with where Stillwagon said he had fired shots. The detectives also knew: 1) the location of the motorcycle, the truck, and shell casings at the scene; 2) that there was an empty shell casing in the chamber of Stillwagon's gun; 3) that there was no blood splatter consistent with a gunshot wound; and 4) that Mattingly had a blue baseball bat and beer cans (at least one opened) in his truck, smelled strongly of alcohol in the parking lot, and was alert and talking at the scene.

After the interview and before arresting Stillwagon, Detective Segaard and his supervisor Detective Sergeant Radabaugh watched a surveillance video from Eagles Lodge, a property adjacent to the Auto Zone, which recorded the events that happened in the Auto Zone parking lot. The video shows Mattingly's truck leave and re-enter the parking lot heading toward Stillwagon: It shows the truck come to a stop, and Stillwagon walk toward the passenger side of the truck, pause, and then walk around the truck toward the driver-side door. At no time did Stillwagon ever take "a shooting stance." As Mattingly quickly exited the truck, Stillwagon grabbed him, kicking

him in the knee and then hitting him in the head with the butt of his gun. This was consistent with what Stillwagon had already told officers.

But, after watching the video, Detectives Segaard and Gerke and Detective Sergeant Radabaugh conferred and decided to file a felonious assault charge against Stillwagon, instructing Officer Willauer to prepare the complaint. Stillwagon was formally arrested at 8:48 P.M. on September 30, 2012. Segaard and Gerke then left the police station to go speak with Mattingly at the hospital. When they arrived, the detectives learned that Mattingly had left the hospital with his wife without being discharged. Later that night, Segaard spoke with Mattingly on the phone to set up an interview the next day but reported that Mattingly did not seem particularly interested in participating in the investigation.

At 8:04 A.M. on October 1, 2012, Officer Willauer filed a criminal complaint against Stillwagon, alleging that he committed felonious assault when he "did knowingly attempt to cause serious physical harm" to Mattingly by "discharging a firearm at him at least six times, ultimately striking him in the head." Willauer later confirmed that the allegation in the criminal complaint was that Stillwagon had shot Mattingly in the head, not that Stillwagon had physically hit Mattingly on the head.

On October 5, 2012, Detectives Segaard and Gerke, and Officers Ailes, Flynn and Willauer completed their incident reports. Segaard, as the lead investigator, also completed a grand-jury packet that included those incident reports and also created a PowerPoint presentation. The cover page of the grand-jury packet states that the charges were for attempted murder and felonious assault, despite a prosecuting attorney advising Segaard that felonious assault would be a more appropriate complaint than attempted murder, given the facts as Segaard had described them.

Segaard's grand-jury synopsis labeled this a "mutual road rage incident" and stated that it was Stillwagon who pursued Mattingly and then discharged a firearm at Mattingly's vehicle "ultimately shooting him in the head." However, there is no evidence in the record that Mattingly was ever shot, much less shot in the head. The district court held that considering the evidence in the light most favorable to Stillwagon, a reasonable officer would have credited Stillwagon's assertion that he physically hit Mattingly in the head with the gun and did not shoot him.

Detective Segaard presented the case to the grand jury, claiming that Stillwagon had shot Mattingly in the head. His incident report to the grand jury states that although the video is difficult to see, "close examination reveals Stillwagon taking a shooting stance as he approaches the passenger side of the truck." Also, in an October 2 email to prosecutors, Segaard wrote the "really good thing" is that the shooting of Mattingly was caught on video and that when he put a magnifying glass on his screen he "could see Stillwagon take a shooting stance at least three times." The district court notes that "Segaard, despite viewing the video multiple times and at various magnifications during his deposition, admitted that he was unable to identify the moment in the video where Stillwagon allegedly stopped and took a shooting stance near the rear bumper."

In that same email, Segaard reported to prosecutors: "The biggest support of Stillwagon's assertion that he struck the victim with the gun came from law enforcement officers who are familiar with fire arms. The gun was found in a condition that is consistent with being fired against an object." This is referring to the fact that Stillwagon's gun was found with an empty shell casing in its chamber and that the gun had a red substance on it that looked like blood.

Detective Segaard's "proof" that Mattingly had been shot in the head came from his own "interpretation" of the cut on Mattingly's head, specifically that he found no stippling marks,

which indicated it was not a close-range shot, supporting Segaard's theory that Stillwagon shot Mattingly from 9-10 feet away. In support of his "interpretation," Segaard relied on statements from three (3) witnesses to the Auto Zone parking lot encounter. While they all reported seeing shots fired, their stories were factually inconsistent and contradictory. Stillwagon alleges that those statements were altered by Segaard to comport with his version of events. Further, Segaard omitted a fourth statement made at the scene by witness Daniel Powell, who said he saw Stillwagon hit Mattingly on the head with a gun. Powell's was the only witness statement consistent with the footage from the video tape and Stillwagon's testimony.

Detective Segaard also created a grand-jury synopsis PowerPoint presentation in which he omitted critical acts and facts and misstated or misrepresented others. For example, he created a "Road Rage" slide which stated there were "multiple reckless operation instances [by] both Parties" and that the road rage "ended at one point" but was "started back up again by Stillwagon." This is not true and is the exact opposite of what actually happened. It was Mattingly who lay in wait for Stillwagon. Segaard fails to mention that Stillwagon asked a witness to call the police and that the police were in fact called. Further, Segaard omitted 6 miles of the 15-mile interaction. After the Watkins Road incident, Segaard omitted the incident at Section Line Road where Mattingly lay in wait for Stillwagon and then tried to run him over. Instead, Segaard told the grand jury that the next incident occurred when Stillwagon "caught up with Mattingly at US 23 off-ramp."

For the parking-lot portion of his presentation to the grand jury, Detective Segaard created an "animated diagram" to illustrate the movements of participants as displayed by the security video. In an email, assistant prosecutor Doug Dumolt complimented Segaard on his presentation, saying, "I especially liked the animation of the vehicle and the blood from the victim." The slides

show Stillwagon firing a shot directly at Mattingly and then show Mattingly getting shot in the head, blood and all. Neither of these events ever happened.

Four months later, in January 2013, the case went before a grand jury. Mattingly and Detective Gerke were not called to testify. Instead, the prosecution relied on Detective Segaard's investigation report and PowerPoint presentation. The grand jury indicted Stillwagon on four counts of felonious assault. The criminal case against Stillwagon went to trial on October 1, 2013. The trial judge found that no evidence in the record could support a conviction and dismissed each of the counts against Stillwagon and entered a judgement of acquittal pursuant to Ohio Criminal Rule 29.

III (Procedural History)

Stillwagon filed two actions under 42 U.S.C. § 1983 against the Delaware Police Department and individual officers/detectives. In the first case, Detective Benjamin Segaard, former Detective Patrick Gerke, Officer Adam Willauer, and Detective Sergeant Jonathan Radabaugh were sued for false arrest, malicious prosecution, civil conspiracy, abuse of process, defamation, assault, and spoliation of evidence. The second § 1983 action was filed against Officer James Ailes, Officer Jason Flynn, former Detective Patrick Gerke, and the City of Delaware for excessive force, failure to prevent excessive force, and municipal liability. These two cases were consolidated in district court in October 2016.

The parties made cross-motions for summary judgment, with the police claiming qualified and absolute immunity. The district court entered a 103-page opinion and order on August 15, 2017. The court denied Stillwagon's motions for summary judgment on all claims and granted

summary judgment in favor of the City of Delaware for municipal liability and in favor of Officer Willauer for supervisory liability. Stillwagon did not appeal.

The district court denied the defendants qualified immunity as to Stillwagon's Fourth Amendment § 1983 claims of false arrest and malicious prosecution, and federal civil-conspiracy claims (Detective Segaard, Detective Gerke, Officer Willauer, and Detective Sergeant Radabaugh); excessive force (Officers Flynn and Ailes); and supervisory liability (Detective Sergeant Radabaugh). The court also denied the defendants immunity under the Ohio Revised Code as to state-law claims (Detective Segaard, Detective Gerke, Officer Willauer, and Detective Sergeant Radabaugh). The municipal defendants timely appealed on August 18, 2017. Defendants state that they do not dispute the facts as set forth by the district court, although in their briefing defendants never acknowledge that Stillwagon was prosecuted for *shooting* Mattingly in the head. Rather, they argue that it was reasonable to prosecute Stillwagon for *hitting* Mattingly in the head.

IV (Immunity)

This court conducts a de novo review of an order denying qualified immunity on summary judgment. *See Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Law-enforcement officers enjoy qualified immunity from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *White v. Pauly*, 137 S. Ct. 548, 551 (2017). In evaluating whether rights are clearly established, all reasonable inferences are given to the non-moving party, (i.e., Stillwagon), but we "consider only the facts that were knowable to defendant officers." *White v. Pauly*, 137 S. Ct. at 550 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015)); s*ee also King v. Harwood*,

No. 17-3873, *Stillwagon v. City of Delaware, Ohio, et al.*

852 F.3d 568, 582 (6th Cir. 2017), *cert. denied*, *Harwood v. King*, 2018 U.S. LEXIS 378 (U.S., Jan. 8, 2018).

Rights are clearly established when a legal principle clearly prohibits the officer's conduct in question. *District of Colombia v. Wesby*, 138 S. Ct. 577, 590 (2018). To be clearly established the rule must be "settled law" which means it is dictated by "controlling authority" or "a robust consensus" of cases of persuasive authority. *Id.* at 589-90 (citations omitted). It should not be defined at a high level of generality but must be particularized to the facts of the case and, in light of pre-existing law, the unlawfulness must be apparent. *King*, 852 F.3d at 582. While the Supreme Court "does not require 'a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Put more plainly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589, *White v. Pauly*, 137 S. Ct. at 551. The district court held that the individual defendants were not entitled to qualified immunity based on their knowing violations of the law.

We note that, on appeal, defendants at times argue for different facts than those contemplated by the district court. Defendants now frame the underlying issue as whether Stillwagon *hit* Mattingly in the head. But Stillwagon was prosecuted for *shooting* Mattingly in the head and his § 1983 claims arose from defendants' affirmative efforts to create a false narrative of events by fabricating evidence, filing false reports, and making misleading omissions in an effort to "prove" that Stillwagon *shot* Mattingly in the head, even though no such shooting occurred. We decline to address this factual discrepancy, as an interlocutory appeal of a denial of qualified immunity based on evidentiary disputes is not permitted. *Johnson v. Jones*, 515 U.S. 304, 313

13

(1995). The appealable issue is, whether the facts as asserted by Stillwagon (i.e., malicious prosecution for shooting Mattingly in the head) violated clearly established law. Our holding addresses this legal issue, not any factual dispute raised for the first time by defendants on appeal.

## V (False Arrest)

The Fourth Amendment protects the right of individuals to be secure in their persons, houses, papers, and effects, against unreasonable seizures. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *Wesby,* 138 S. Ct. at 585. To determine whether an arrest was reasonable and whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest and then decide, 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer amount to probable cause.'" *Wesby*, 138 S. Ct. at 586 (citation omitted).

Probable cause is a "fluid concept" that "depends on the totality of the circumstances" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586. The "initial probable cause determination must be founded on 'both the inculpatory *and* exculpatory evidence' known to the arresting officer." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007). Thus, an officer "cannot simply turn a blind eye toward potentially exculpatory evidence . . . ." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). "[P]robable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause determinations involve an examination of all [the] facts and circumstances within an officer's knowledge at the time of an arrest." *Ibid*.

Stillwagon does not assert a claim of false arrest for his initial detention and interview. His false-arrest claim arose when he was formally arrested at 8:48 P.M. on September 30, *after* his interviews with Ailes, Segaard, and Gerke; *after* witness Daniel Powell had given his on-scene statement that Mattingly had left and re-entered the parking lot and that Stillwagon physically struck Mattingly on his head; and *after* Segaard and Radabaugh had seen the video of the Auto Zone parking-lot. Stillwagon was arrested for felonious assault, which under Ohio law is committed when a person knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance. O.R.C. § 2903.11(A)(2). A person acts knowingly when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.

The district court held that a jury could reasonably conclude that the officers lacked probable cause to arrest Stillwagon for felonious assault based on the shots he fired at Mattingly's truck, as they had insufficient information to suggest that Stillwagon knowingly attempted to cause Mattingly physical harm by means of a deadly weapon. Stillwagon described repeated efforts to distance himself from Mattingly and his truck, numerous instances where he could have shot Mattingly if he had wanted to, and his attempt to shelter in place by the concrete pillar in the parking lot. The district court concluded that all "these efforts evidenced Stillwagon's reluctance to engage and, thus, that he did not knowingly attempt to harm Mattingly" by firing at the truck Stillwagon's statement of what happened was bolstered by independent evidence: the location of the bullet holes, which suggested Stillwagon was shooting defensively and were situated in areas of the truck that were far from Mattingly; and the video from the parking lot.

The district court also held that a jury could reasonably conclude that a reasonable police officer would have conclusively known that Stillwagon was acting in self-defense and that

probable cause to arrest him for felonious assault was, therefore, lacking regarding the blow Stillwagon delivered to Mattingly's head using the butt of his pistol. To prove self-defense in Ohio, the accused must prove by a preponderance of the evidence that 1) he was not at fault for creating the violent situation, 2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm, 3) that his only means of escape was the use of force, and 4) that he did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 673 N.E.2d 1339, 1342 (Ohio 1997); *State v Williford*, 551 N.E.2d 1279, 1281 (Ohio 1990).

The district court held that that a reasonable officer also could have conclusively known that Stillwagon was not at fault for creating the confrontation based on Stillwagon's statements that a) Mattingly had repeatedly tried to kill him; b) Mattingly's attacks were unprovoked; c) Stillwagon attempted to distance himself from Mattingly; d) Stillwagon attempted to take shelter near a concrete pillar; as well as e) the location of the bullet holes in Mattingly's truck, which supports Stillwagon's statement that he was firing defensively.

Stillwagon had a bona fide belief he was in imminent danger of death or great bodily injury and that his only means of escape was the use of force because a) Stillwagon had informed officers that he was afraid for his life; b) he informed officers that Mattingly had tried to kill him multiple times; c) the police found the baseball bat in Mattingly's truck; and d) the parking-lot video supported those statements, as it shows Mattingly leaving the parking lot and then re-entering the parking lot driving directly at Stillwagon. In hitting Mattingly on the head with the butt of his gun, Stillwagon used only the amount of force reasonably necessary to repel Mattingly's attacks.

Even if Stillwagon had used deadly force, he did not violate a duty to retreat when he entered the Auto Zone parking lot because he had driven to the concrete pillar in an attempt to take

cover and use it as a shield against Mattingly's truck; had made previous efforts to distance himself; and he had no reasonable means to retreat given Mattingly's aggressive conduct and the possibility he might have a gun. Stillwagon did not violate a duty to retreat when he approached Mattingly because a) he told officers that the truck had stopped in front of him after Mattingly re-entered the parking lot; b) Mattingly exited the truck with a hand down; and c) Stillwagon feared he might have a gun. Ohio law requires a person to retreat only if he has a reasonable means to do so. *Williford*, 551 N.E.2d at 1282. The district court concluded such means did not exist here. We agree.

Based on what a reasonable officer could have known as set forth above, we affirm the district court's holding that, when viewing the evidence most favorably toward Stillwagon, a jury could reasonably conclude that officers lacked probable cause to arrest Stillwagon for felonious assault and that the evidence produced by Stillwagon, viewed in the light most favorable to him, shows that he was falsely arrested.

## VI (Malicious Prosecution)

"Individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute'" that individual. *King v. Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017). To prevail on a 42 U.S.C. § 1983 malicious-prosecution claim, a plaintiff must prove that 1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; 2) no probable cause existed for the criminal prosecution; 3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and 4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).

Defendants commit malicious prosecution when they "knowingly or recklessly" make false statements that are material to the prosecution, as in reports or in affidavits filed to secure warrants. *King v. Harwood*, 852 F.3d at 583. A Fourth Amendment violation for wrongful prosecution "can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statement." *Manuel v City of Joliet*, 137 S. Ct. 911, 920 (2017). "[A]n officer's actions of wrongly setting a prosecution in motion or falsifying or fabricating evidence may be material to the grand-jury indictment *even though* they do not constitute 'testimony'. . . ." *King v. Harwood*, 852 F.3d at 590.

Since 2012, the Supreme Court has extended to law-enforcement officers absolute immunity for their acts as grand-jury witnesses. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). As a rule, when a plaintiff is arrested pursuant to a grand-jury indictment, "the finding of the indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause. *Webb*, 789 F.3d at 660. But, the presumption of probable cause created by a grand-jury indictment is rebuttable "where 1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements . . . or falsifies or fabricates evidence; 2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and 3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony . . . ." *King v. Harwood*, 852 F.3d at 587-88.

The only defendant to testify before the grand jury was Detective Segaard and the district court held he was entitled to absolute immunity as a grand-jury witness. However, the district court also noted the malicious-prosecution exceptions set forth in *King* and considered whether Stillwagon had produced evidence that would allow him to rebut the presumption of probable

cause by the grand-jury indictment and bring a § 1983 claim against Detective Segaard. In assessing the malicious-prosecution claim, the district court listed the following omissions, false statements, and fabrications of evidence committed by Detective Segaard in laying the groundwork to indict Stillwagon.

1) The day after the incident, witness Tina Bickham called Detective Segaard to report that she saw Mattingly driving toward her, heading north on Route 42's southbound lane, and she was forced off the road to avoid being hit by his truck. Segaard omitted this call from his investigation report and the grand-jury packet and never informed the prosecution of Bickham's call.

2) Kevin Cogan was another witness who was also forced off the road when Mattingly drove north on Route 42's southbound lane. Cogan called Segaard to explain what he observed. Stillwagon maintains that Segaard tried to influence Cogan with false information, namely that it was a lengthy, mutual, road-rage incident.

3) Ruth Sayre witnessed Mattingly chase and cut in on Stillwagon. She called Segaard to inform him that she did not believe a statement by Mattingly that his truck was having mechanical failures. Sayre's witness statement was omitted from Segaard's investigation report and the grand-jury packet, and her name was not listed in the prosecution's discovery response to Stillwagon.

4) Daniel Powell witnessed the parking-lot incident and gave a statement to police at the scene. Powell described Mattingly leaving and re-entering the parking lot and described how Stillwagon approached Mattingly and hit him on the head with his gun. He thought Mattingly was going to run over Stillwagon and that it looked like

Stillwagon was just trying to avoid the vehicle. This witness statement was also omitted.

5) Segaard purportedly hid the record of the 911 call made when Stillwagon pulled off the road near Watkins Road. Stillwagon told Segaard in his initial interview that he had asked motorists to call 911 and asked Segaard to check dispatch records. Segaard told prosecutors that he had checked the Delaware communication center but found no record of such a call.

6) Segaard made false statements in an email sent to prosecutors, stating that when he watched the parking-lot video he could see Stillwagon taking a "shooting stance."

Detective Segaard also made the following omissions and falsehoods in his investigation report that was later submitted to the grand jury:

1) He omitted any reference to witnesses Bickham or Sayre.

2) He offered a false description of the parking-lot video, stating that he could see Stillwagon taking a shooting stance.

3) He asserted that that Stillwagon "fired and shot Mattingly in the head." Segaard made this statement despite evidence that Mattingly was not shot, as evidenced by the nature of the wound, the absence of a shell casing near the truck, Stillwagon's insistence that he hit Mattingly over the head, the presence of an empty shell casing in Stillwagon's pistol and the presence of reddish residue on the pistol's rear sight.

4) He omitted Mattingly's admission that his truck's backup lights may have come on after he stopped at the end of the exit ramp.

5) He stated in his report that before beginning his interview of Stillwagon, he had been informed that Stillwagon had already confessed to the shooting to Officer Ailes. Ailes subsequently acknowledged that Stillwagon made no such confession.

6) He suggested that Stillwagon caught up with Mattingly intentionally on the exit ramp.

7) He stated that Stillwagon had fired shots on the exit ramp, only 20-30 feet away from Mattingly's truck, despite the fact that the shell casings had been found 140-160 feet from the end of the ramp.

8) He failed to mention that that Stillwagon stopped and waited at the traffic light at the end of the exit ramp before proceeding.

9) He incorrectly wrote that Stillwagon admitted to following Mattingly into the Auto Zone parking lot.

10) He failed to mention that Stillwagon drove directly to the concrete pillar and did not follow Mattingly's path into the parking lot.

The district court noted that all this alleged false and fabricated evidence by Detective Segaard was prepared four months before he testified in front of the grand jury. The court concluded that such evidence could be viewed at laying the groundwork for an indictment but could not be viewed as a preparatory activity for grand-jury testimony and therefore not protected by absolute immunity. Applying the legal principles set forth in *Rehberg* and *King*, we agree with the district court.

Defendants Segaard, Gerke, Willauer, and Radabaugh also sought qualified immunity from Stillwagon's malicious-prosecution claims. Under all the facts set forth above, the district court held that a jury could reasonably conclude that the officers lacked probable cause to prosecute Stillwagon, irrespective of his eventual indictment. The district court further noted Detectives

Segaard and Gerke's purported effort to manipulate Mattingly when they interviewed him about the incident. Mattingly was interviewed twice: October 1, 2012, the day after the incident at his home by Segaard and a victim advocate, and October 2, 2012, at the police station by Segaard and Gerke. The detectives knew that Mattingly had served 10 years in prison for shaking his infant son to death and was afraid of violating parole. During his interview, Mattingly denied any memory of being shot, but was pressured by Gerke and Segaard to say that Stillwagon had shot him. The transcript of Mattingly's interview shows that the officers were clearly frustrated by Mattingly's initial, unconvincing description of the incident. They tried to convince Mattingly that he had been shot in the head and help him come up with a plausible reason, other than aggression, as to why he re-entered the Auto Zone parking lot after leaving.

Based on this extensive evidence of the defendants knowingly making omissions, giving false statements, and fabricating evidence in the prosecution of Stillwagon, we affirm the district court's holding that a jury could reasonably conclude that defendants Segaard, Gerke, Willauer, and Radabaugh engaged in malicious prosecution of Stillwagon and are not entitled to either absolute or qualified immunity.

## VII (Civil Conspiracy)

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a § 1983 civil-conspiracy claim, a plaintiff must show that 1) "a single plan existed;" 2) the alleged co-conspirator "shared in the general conspiratorial objective" to deprive plaintiff of his constitutional or federal statutory rights; and 3) "an overt act was committed in furtherance of the

conspiracy that caused injury" to the plaintiff. *Ibid.* Direct evidence is not required, and circumstantial evidence may provide adequate proof. *Id.* at 606.

The district court found that a jury could reasonably conclude that Detectives Segaard and Gerke, Detective Sergeant Radabaugh, and Officer Willauer entered into an agreement to falsely prosecute Stillwagon based on:

1) Evidence that Segaard conversed with the other officers around the time of Stillwagon's interview and that they decided as a unit to file the complaint.

2) The officers' knowledge of the evidence in this case, which does not establish probable cause to arrest or prosecute Stillwagon, indicates that the officers entered into an agreement to unlawfully injure Stillwagon.

On appeal, defendants perfunctorily argue that there is no underlying constitutional violation, which we reject, and that as a legal matter a corporation and its employees are one entity and therefore cannot form a conspiracy. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991). This intra-corporate conspiracy doctrine is a new theory, was not raised below or addressed by the district court, and therefore we hold it is waived on appeal.

VIII (Supervisory Liability)

The district court held that Detective Sergeant Radabaugh was not immune from a claim of supervisory liability for the officers under his command. It is well established that a government official may not be held liable for the unconstitutional conduct of a subordinate under a respondeat superior or vicarious-liability theory. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). A supervisor's mere failure to act is insufficient to establish supervisory liability. *Ibid.* To

hold a supervisory official liable under § 1983, a plaintiff must demonstrate that the actor engaged in some active unconstitutional behavior. *Ibid.*; *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A supervisor can be held liable if he "encouraged specific misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

The district court held that Radabaugh directly participated in his subordinates' alleged unconstitutional behavior. He went to the Auto Zone parking lot, learned of and helped document evidence at the scene, learned of evidence suggesting that Stillwagon did not attempt to shoot Mattingly and that he had acted in self-defense. Radabaugh also watched the parking-lot video, called a local hospital to determine where Mattingly had been taken, acknowledged that on September 30, the day of the shooting he did not know the source of Mattingly's injury (i.e., gunshot or blunt-force trauma). He also watched Segaard and Gerke's interview of Stillwagon, spoke with Gerke about how the investigation would move forward, and ordered Segaard to direct Officer Willauer to file the criminal complaint against Stillwagon. His involvement continued after the filing of the criminal complaint. He recovered the surveillance video from the Marathon station, instructed Segaard to speak with the news media about the case, reviewed the physical and forensic evidence from Mattingly's truck, and read Segaard and Gerke's investigation reports and approved the steps they were taking to investigate the case.

Based on the evidence detailed in the district court's opinion and taking that evidence in the light most favorable to Stillwagon, we hold that Detective Sergeant Radabaugh at the very least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates, and he is not entitled to immunity from liability in his supervisory capacity.

IX (Excessive Force)

Excessive-force claims are analyzed under the Fourth Amendment reasonableness standard. *Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008). To prevail, a plaintiff must establish that 1) he was subject to seizure and that 2) the seizure was unreasonable. *Ibid.* Here, the question is whether the seizure was unreasonable. To determine reasonableness, this court must consider all the facts and circumstances of the arrest, including 1) the severity of the crime at issue, 2) whether the suspect posed an immediate threat to the safety of officers, and 3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Stillwagon's excessive-force claims are against Officers Ailes and Flynn based on Officer Ailes physically shoving and cramming him into a police cruiser and based on Officer Flynn taping Stillwagon's hands "tourniquet tight" in plastic "evidence" bags during booking. The district court held that the evidence, viewed in the light most favorable to Stillwagon, shows use of excessive force in violation of Stillwagon's constitutional rights.

When Officer Ailes took control over Stillwagon, Stillwagon was lying on the ground at the scene with his hands double handcuffed behind his back. Ailes decided to put Stillwagon in Officer Flynn's police cruiser. Stillwagon was respectful and cooperative throughout and did not engage in any threatening or resistive behavior. Ailes advised Stillwagon, who was lying on the ground on his stomach with his hands cuffed behind his back, to roll over onto his butt so he could stand up. Stillwagon told Ailes that he had a fake shoulder and two fake knees, so he would need assistance getting up. Stillwagon asked if his hands could be cuffed in front of his body. Ailes said he could not do that. Ailes took Stillwagon to the police cruiser and opened the rear driver-

side door. Ailes had Stillwagon put his butt in first, but as he attempted to sit down, Stillwagon complained that his shoulder was "f**** up" and asked Ailes to wait a minute. As he was sitting, Stillwagon told Ailes that he did not think he could fit in the back seat. Ailes nonetheless began pushing Stillwagon into the vehicle. Stillwagon suggested he lie on his stomach, and asked Officer Ailes to grab his legs. Stillwagon got stuck and asked Ailes to wait, that he was having shoulder problems, but Ailes kept pushing. Stillwagon again reminded Ailes of his fake shoulder. Eventually, Stillwagon was able to roll on his stomach. Ailes attempted to close the door, but it bounced off Stillwagon's feet. So, Ailes tried a second time, pushing Stillwagon's feet with the door. Stillwagon was left wedged in the backseat of the cruiser on scene for about half an hour.

The right to be free from physical force when one is not resisting arrest is a clearly established right. *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015). The use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law. *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). Here it is undisputed that Stillwagon was cooperative, did not pose a threat to officers, was cuffed, and did not resist arrest. We affirm the district court's finding that when viewing the evidence in the light most favorable to Stillwagon shows Ailes used excessive force in violation of Stillwagon's constitutional rights.

Stillwagon claimed that Officer Flynn used excessive force during booking when he placed plastic "evidence" bags on his hands in an effort to preserve gunshot residue. Paper bags are usually used for such a procedure, but for an unexplained reason, Flynn used plastic bags. Flynn secured the bags on Stillwagon's hands with police tape. He wrapped the tape on "tourniquet tight," so tight that Stillwagon "could hardly feel" his hands. Stillwagon said the tourniquet-tight tape cut off his blood supply and caused "numbness and tingling" in his hands. Stillwagon stated to Flynn: "My wrists are killing me." Stillwagon asked for the bags to be taken off, but Flynn said

he could not take the bags off until he was ordered to do so. Stillwagon said the bags were completely steamed up and were on his hands for 15-20 minutes. When Flynn and Detective Segaard finally went to remove the bags, they could not get the bags off because they were taped on so tightly. Segaard started "stabbing at the bags with scissors because it was so tight."

Detective Segaard admitted that there was a procedural mistake in using plastic bags instead of paper bags, but he does not say why they were used. Stillwagon testified that he complained, told Flynn his wrists were "all screwed up," and informed Flynn that his wrists were "killing" him. Despite his knowledge of Stillwagon's previous injury and his complaint of wrist pain, Flynn left the bags on Stillwagon's hands. Flynn argued that Stillwagon never asked for the tape on his wrists to be loosened; and that Stillwagon's claim that his hands were tightly bound and perspiring does not demonstrate objectively unreasonable behavior.

It is well established that handcuffing a suspect too tightly violates the Fourth Amendment prohibition against excessive force. *Walton v City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). An officer uses excessive force by handcuffing a suspect too tightly if 1) the suspect complained the handcuffs were too tight; 2) the officer ignored those complaints; and 3) the suspect experienced a physical injury resulting from the handcuffing. *Morrison v. Bd. of Trs.*, 583 F.3d 394, 401 (6th Cir. 2009). While *Morrison* refers to handcuffing, not hand taping, there does not need to be 'a case directly on point,' so long as existing precedent places the lawfulness of the particular arrest 'beyond debate.' *Wesby*, 138 at 590 (citations omitted).

Despite having different purposes, tight handcuffing and the tight hand taping both constrain the movement of a person's wrists. From an excessive-force analysis, both can cut off

circulation and cause the restricted person's hands to go numb as a result of restricted blood flow. This court's tight-handcuffing precedent puts officers on notice that they cannot cut off the circulation to a suspect's wrists—regardless of how they do it. This means that the right was clearly established at the time Flynn allegedly taped Stillwagon's hands too tightly.

We affirm the district court's finding that Officers Ailes and Flynn are not entitled to immunity from claims of excessive force.

X

Stillwagon has also asserted related claims under Ohio law, and the district court denied statutory immunity. Defendants ask us to review that ruling as well. But we may exercise our pendent appellate jurisdiction only when we cannot resolve federal immunity issues without addressing related nonappealable collateral state-law issues. *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 752 (6th Cir. 2015). Here, we have resolved the federal immunity issues without considering the state-law issues, so we lack jurisdiction to consider the district court's ruling as to defendants' claimed immunity under Ohio law.

XI

For the reasons set forth above, we AFFIRM the district court's denial of qualified immunity and DISMISS defendants' appeal as to the district court's denial of statutory immunity under Ohio law.