**AFFIRMED and Opinion Filed December 31, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-20-00223-CR

**ROBERT SAMUEL VEAL, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-80509-2019**

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Garcia
Opinion by Justice Schenck

Appellant Robert Samuel Veal appeals his capital murder conviction following a trial before a jury. In two issues, appellant urges the evidence is insufficient to support his conviction and the trial court erred in failing to suppress the seizure and search of his cell phone. We affirm the trial court's judgment. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

BACKGROUND

Kelli Underwood was brutally murdered in her home on or about September 17, 2017. Her daughter discovered her body on September 20, 2017, when she went to check on her. The State's theory of the case was that Underwood was killed in a murder-for-hire plot that involved her employer and paramour, Ronnie Welborn, and his girlfriend, Kadie Robinson, engaging appellant to carry out the plot. The jury was charged and instructed on the law of capital murder and party liability and found appellant guilty. This appeal followed.

## DISCUSSION

## I. Sufficiency of the Evidence

In his first issue, appellant challenges the legal sufficiency of the evidence supporting his conviction.

### A. *Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979), and *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. We defer to the trier of fact's determinations of credibility and may not substitute our own judgment for that of the fact finder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality

op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Juries are permitted to draw reasonable inferences from the evidence, but they are not permitted to draw conclusions based on speculation. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

### B. *Capital Murder and Law of Parties*

In this case the jury found appellant guilty of capital murder for remuneration.[1] A person commits the offense of capital murder if he commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. TEX. PENAL CODE ANN. § 19.03(a)(3), (b). A person is a criminally responsible party for an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both. *Id.* § 7.01. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

To determine whether an individual is a party to an offense, we look to "events before, during, and after the commission of the offense." *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977). We also look to circumstantial evidence to prove party status. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

---

[1] Remuneration is a reward given or received because of some act. *Beets v. State*, 767 S.W.2d 711, 734 (Tex. Crim. App. 1987).

There must be sufficient evidence of an understanding and common design to commit the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties. *Id.*

### C. *The Evidence*

Underwood, Robinson, and Welborn worked for the same company. Welborn was romantically involved with both women. Approximately nine months before her death, Underwood learned that Robinson was pregnant with Welborn's child. Thereafter, Underwood began working from home because the office environment was uncomfortable. Welborn often picked up paperwork from Underwood at her home. Robinson took Welborn's daughter from another relationship to an elementary school located near Underwood's house. From the school's drop-off area, Robinson could see Underwood's house and determine when Welborn was at her home.

Text messages between Welborn and Robinson revealed Robinson was jealous over Underwood's involvement with Welborn. On August 18, 2017, Robinson gave Welborn an ultimatum. She gave him a month to get rid of Underwood, or she was going to leave him.

The initial plan to get rid of Underwood was to plant drugs in her truck and tip off the police so that she would be sent to prison. Welborn approached appellant

–4–

in this regard. Appellant was known to both Welborn and Underwood as he had worked for Welborn and, beginning in late August 2017 until her death, he was working for Underwood repairing her pool and installing surveillance cameras on her property.

On August 22, Welborn sent a text to Robinson stating that appellant took the money, had the "stuff," and had to place it in the truck. During that exchange, Robinson stated, "But I want you to promise me that if this doesn't work, you're going to try the other."

It appears the plan quickly changed from planting drugs to killing Underwood. On August 26, appellant sent a message to an individual named Delvin Powell stating that he had a job for him. In early September, appellant sought out a "quiet" firearm while Powell sought out a .22-caliber firearm. On September 7, appellant told Powell that they "[h]ave to get it ASAP because Underwood had just broke[n] the window of a friend's truck with a two-month-old baby in it." This reference was consistent with an altercation that had recently occurred between Robinson and Underwood. Powell responded, "Don't forget to tell him nothing has been like said" and "he's got to come off at least two more." Powell clarified that he meant pay $2,000 or provide 2 ounces of drugs. Powell asked appellant if he still had speakers hooked up at Underwood's home. When appellant responded in the affirmative, Powell explained that they could turn up the volume on the stereo, Powell could "go to work" and "come out like nothing happened."

On September 10, appellant messaged Powell, "Get pumped." Powell responded, "All I ask is that you be 100, and we'll get her I'm pretty sure. I got the shells covered. Let me know where you wanna meet so she can drop me off." That same day, Powell messaged another person that he was going to be paid $2,500.

On September 11, Welborn took Underwood's keys and put them in her mailbox. On September 12, appellant told Robinson that she and Welborn were "going to owe him big." That same day, Welborn asked Robinson when "it" was going to happen, and Robinson responded that it was supposed to happen that night and that she was going to talk to appellant about it.

On September 15, Robinson texted Welborn that appellant "can easily get it done if he is sleeping on her couch." Welborn advised Robinson that appellant was not going to do it, and Robinson responded that Welborn should tell appellant he wants the money back and he "better do the other like you said." That same day, Underwood texted appellant that she wanted him to finish the backyard and that he should bring the cameras. Also, that day, Powell messaged his girlfriend that he was at the "mark's" house putting an end to this and asked her to pray for him. And Powell messaged appellant's wife, "If it needs to be done, I will do it. Not him. I'm doing this more for you and the kids first. Him second. Me third. Everything I do is for the sole purpose of everyone['s] unity and survival. We are working hun. I swear. Trying to get it done ASAP."

From September 15 to 16, appellant searched for information regarding a Uniden surveillance camera. Paperwork concerning this type of camera was found on Underwood's bed after her death.

On September 16, Welborn withdrew $4,000 from his personal bank account. On that same day, Powell showed up at the house of one of Underwood's neighbors. Powell and the neighbor were acquaintances from Powell's place of employment, a gas station. Powell was at the neighbor's house for two hours and acted as if he were high on drugs. When Powell left the neighbor's house, he walked across the street to Underwood's home. A subsequent forensic study of Powell's internet usage placed him in Underwood's home on that day. Notwithstanding appellant's waffling on September 15, on September 16, appellant communicated with Robinson eighty-one times and continued to communicate with her thereafter.

At 9:00 a.m. on September 17, Underwood's alarm company sent a notification that her monitor was no longer working.

On September 20, Underwood's neighbor saw Powell walk out of Underwood's house but did not see Underwood, which was unusual because she usually walked her guests out. A man and a woman carrying a baby carrier accompanied Powell.

Underwood's daughter tried to contact her mother on September 19 and 20 but received no response. On September 20, she went to Underwood's home to check on her. When she arrived, she found the front door unlocked and her mother's

body on the floor in her craft room. She had been shot and stabbed. Music was playing on the television. The genre of music playing was not typical of the music Underwood listened to.

In addition, items had been knocked over and dishes and food were left out in the kitchen, which was unusual as Underwood kept a tidy home. The drawers in the bedroom were opened and a glass bowl had been knocked to the floor. The only item Underwood's daughter could tell was missing was a monitor for the surveillance cameras. Underwood's daughter called 9-1-1 at 6:14 p.m., followed by a call to Welborn at 6:20 p.m. Welborn then called appellant and Robinson.

A sheriff's deputy collected various items from Underwood's house, including spent .22-caliber cartridge casings, eating utensils, and cigarette butts. Appellant's DNA matched the DNA on one of the utensils. Powell's cell phone was seized, and one of Underwood's cell phones was collected at the scene. After the police finished their investigation of the house, Underwood's daughter cleaned the house and found drug paraphernalia and a clear substance behind the dresser. She disposed of the substance.

**D.** *Analysis*

Appellant claims the evidence showed that Underwood's daughter and her daughter's boyfriend had a motive and opportunity to be perpetrators of the crime. The jury heard about the sometimes-volatile relationship between Underwood and

her daughter,[2] text messages between the two, and the lead investigator's view that Underwood's daughter was not a suspect. The jury weighed this evidence against the evidence of others' being involved and found appellant guilty. We must defer to the jury's resolution of any evidentiary conflict in this regard. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

Next, appellant urges that Robinson and Welborn were the actual offenders and that there was no evidence that there was a prior or contemporaneous plan to commit the murder. We disagree. The evidence established that days after the ultimatum, Robinson and Welborn discussed appellant over text messages. Shortly thereafter, appellant messaged Powell telling him that he had a "job" for him, and then both men sought out guns. Powell sought out the same caliber handgun that was used to kill Underwood, and appellant separately sought out a "quiet" gun. Powell also told appellant that he should crank up the music while he got the job done, and when Underwood's daughter entered the house, there was a television paused on techno music, which Underwood did not listen to.

Underwood was believed to have been killed between September 16 and 17. A truck rented to appellant was seen at Underwood's house in the days leading up to her murder. On September 15, Powell messaged his girlfriend that he was at the

---

[2] Underwood's daughter indicated that she and her mother had petty arguments, her mother was arrested for assaulting her in June or July before her death, her mother kicked her out of the house and took away her car. She recalled telling her mother that she and her boyfriend were going to do a drive-by, but she could not recall when she told her this.

mark's house putting an end to this. Powell messaged appellant's wife about doing "it." Powell was seen at Underwood's house on September 16. Forensic evidence placed both appellant and Powell in Underwood's house near the time of her death.

Underwood's neighbor saw Powell at Underwood's house walking with a man and a woman carrying a baby carrier the same day that her body was found. Underwood's daughter made the 9-1-1 call at 6:14 p.m. and called Welborn at 6:20 p.m.; Welborn then called appellant and Robinson. Appellant was the only person connected to Powell. All communications with Powell came through appellant.

We conclude that based on the events before, during, and after the commission of the offense, the jury could rationally infer that appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid others in committing the offense. Accordingly, the evidence was sufficient to support appellant's conviction as a party to capital murder.

We overrule appellant's first issue.

## II.   Motion to Suppress

In his second issue, appellant asserts the trial court erred in denying his motion to suppress the seizure and search of his phone without a warrant in violation of the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. The record

–10–

establishes a warrant issued for the search of appellant's phone, and only the seizure of same is at issue here.

### A. *Standard of Review and Legal Principles*

We review a trial court's ruling on a motion to suppress applying a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). When, as here, the trial court does not make explicit findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). We will sustain the ruling of the trial court if it is correct under any applicable theory of law. *Id.*

The Fourth Amendment guarantees individuals "the right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Gutierrez v. State*, 221 S.W.3d 680, 684–85 (Tex. Crim. App. 2007); *see* U.S. CONST. amend. IV. The Texas Constitution similarly provides: "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches . . . ." TEX. CONST. art. I, § 9. Generally, the seizure of an individual's personal property is *per se* unreasonable within the

meaning of the Fourth Amendment unless the seizure is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. *United States v. Place*, 462 U.S. 696, 701 (1983); *Kothe v. State*, 152 S.W.3d 54, 59 n.10 (Tex. Crim. App. 2004). But there are exceptions to the warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App. 2014). A well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search or seizure is objectively reasonable under the Fourth Amendment. *Weems v. State*, 493 S.W.3d 574, 578 (Tex. Crim. App. 2016).

Once a defendant establishes that a search or seizure was conducted without a warrant, the burden shifts to the State to prove that the search or seizure was reasonable. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). The State can meet this burden by showing the existence of exigent circumstances and that the officer had probable cause for the seizure. *Gutierrez v. State*, 585 S.W.3d 599, 609 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

The exigent circumstances test is met if the risk of the item's disappearance before a warrant may be obtained outweighs the suspect's interest in possession. *Place*, 462 U.S. at 701. For example, an exigency could be shown if a suspect has control over easily disposable evidence. *See McNeely*, 569 U.S. at 153. To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, we look to the totality of the circumstances. *Id.* at 149.

In addition to proving exigent circumstances, the State must also prove that the officer had probable cause to associate the property with criminal activity. *Tex. v. Brown*, 460 U.S. 730, 741–42 (1983). Probable cause is not a high bar. *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). Probable cause obtains if the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be useful as evidence of a crime. *See Brown*, 460 U.S. at 742. "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 138 S. Ct. at 586 (quotations and citations omitted). A practical, nontechnical probability that incriminating evidence is involved is all that is required. *Brown*, 460 U.S. at 742. The State does not need to show that the officer's belief was correct or more likely true than false. *Id.* Probable cause requires only a "probability or substantial chance" of criminal activity. *Wesby*, 138 S. Ct. at 586 (quotation omitted).

## B. *The Evidence*

Appellant established his cell phone was seized without a warrant. Thus, the burden shifted to the State to establish an exception to the warrant requirement. The State relied on the exigent circumstances exception.

At the suppression hearing, Texas Ranger Bruce Sherman testified that on September 28, 2017, he obtained a warrant to obtain a sample of appellant's DNA. At that time, Ranger Sherman was investigating the case and had discovered that

there had been a great deal of electronic communication between Underwood and appellant in the days leading up to Underwood's death and that appellant had rented a black truck that had been seen at Underwood's home. He did not have a warrant to seize appellant's phone at that time.

Ranger Sherman interviewed appellant while he was at his home collecting appellant's DNA. The interview lasted for approximately two hours. Two other officers were present during most of the time as well as appellant's wife and infant child. During the interview, Ranger Sherman asked appellant not to be on his phone and appellant indicated his phone would contain incriminating evidence, specifically regarding drug activity. Appellant admitted to Ranger Sherman that he had cleared his phone the day before and that he routinely does so. Ranger Sherman explained that while deleted content can sometimes be recovered from cell phones, it is not always possible, and an entire phone can be reset. Ranger Sherman asked appellant for his phone. Appellant's wife objected to appellant turning over the phone claiming the phone contained nude photographs of her. Appellant, meanwhile, refused to turn over the phone claiming he needed it for work. Ranger Sherman represented that, if appellant turned over the phone, officers would not look at the photographs of appellant's wife and he would do his best to have the phone returned to appellant the following day. Appellant asked, "[W]hat if I say no?" The response was, "[W]e will take it by force." Appellant grabbed his phone and started

manipulating it. At that point, Ranger Sherman determined that exigent circumstances existed.

C. *Analysis*

Appellant does not contest Ranger Sherman's testimony concerning numerous text messages between appellant and Underwood, the possibility of incriminating evidence on the phone, and that appellant routinely deletes content from his phone. Appellant, relying on *King v. Kentucky* and *Turrubiate v. State*, asserts the exigency exception requires that the record show proof of imminent destruction based on affirmative conduct and the record does not contain evidence appellant was actively deleting evidence from his phone. *King v. Kentucky*, 563 U.S. 452, 460 (2011); *Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013). But *King* and *Turrubiate* were warrantless search cases, not warrantless seizure cases. A seizure does not invade the same sort of privacy interests as a search. *See Cruse v. State*, No. 01-13-00077-CR, 2014 WL 3607250, at *2 (Tex. App.— Houston [1st Dist.] July 22, 2014, pet. ref'd) (mem. op., not designated for publication). In fact, the prohibition on unreasonable seizures is distinct from the prohibition on unreasonable searches. *United State v. Jacobsen*, 466 U.S. 109, 113 (1984). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is

infringed." *Id.* Accordingly, neither *King* nor *Turrubiate* is controlling or instructive here.

Viewing the evidence in the light most favorable to the trial court's ruling, the court could have concluded appellant routinely deleted content from his cell phone, including the day before the phone was seized, and when appellant believed the officers were going to seize his phone, he began to manipulate it in a manner that led Ranger Sherman, an experienced law enforcement officer, to believe he intended to destroy probative evidence. We conclude, under these circumstances, the State showed exigent circumstances for seizing the phone and established the phone might contain evidence of a crime. *See McNeely*, 569 U.S. at 153; *Gutierrez*, 585 S.W.3d at 610 (holding exigent circumstances existed to seize cell phone where trial court could have found Gutierrez was manipulating gallery section of his phone and was in control over easily disposable evidence). We overrule appellant's second issue.

## CONCLUSION

We affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47

200223F.U05

–16–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROBERT SAMUEL VEAL,
Appellant

No. 05-20-00223-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas Trial Court Cause No. 199-80509-2019.
Opinion delivered by Justice Schenck. Justices Smith and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 31st day of December, 2021.